Owen **BREWSTER**

v.

**BOSTON HERALD-TRAVELER CORP.**

Civ. A. No. 55-692-N.

United States District Court
D. Massachusetts.

Nov. 3, 1960.

See also D.C., 20 F.R.D. 416.

James D. St. Clair and Blair L. Perry (of Hale & Dorr), Boston, Mass., for plaintiff.

John M. Hall and Jerome E. Andrews, Jr. (of Choate, Hall & Stewart), Boston, Mass., for defendant.

WYZANSKI, District Judge.

Charge to the Jury.

Mr. Foreman and Members of the Jury: You and I have listened to as excellent arguments as I have ever heard in a jury case, and those arguments place upon us a responsibility to do our job as well as counsel have done theirs.

This, as you know, is a case in which the plaintiff, Owen Brewster, claims that he was libeled by the defendant, The Boston Herald-Traveler Corporation, as a result of an editorial appearing in the issue of Friday, August 6, 1954. The case is in this Court because the plaintiff is a citizen of Maine and the defendant is a corporation organized under the laws of Massachusetts, and the amount in controversy is adequate to vest this Court with jurisdiction of the case.

■ In connection with certain aspects of this controversy federal law governs. That is to say, the relationship between the Judge and the Jury is, for example, controlled by federal rules. Other aspects of the law are controlled by state law, and I shall in some degree make explicit the extent to which state law governs aspects of this case.

■ Let me at the outset remind you that you, as jurors, are the sole judges of the credibility of the witnesses and of all the facts in the case. Whatever may have been said by the lawyers or may be said by me about the facts is intended merely as guidance to you, and which you are entirely free to reject, for it is you twelve persons who will determine which witnesses you believe and what you regard as the facts.

So far as concerns the law, you are to follow the instructions which I give you upon the law. Needless to say, I may make mistakes with respect to the law, but any errors I make with regard to that will be or have been the subject of exception by counsel, and will be subject to the correction of twelve other persons, to wit, the three Judges of the Court of Appeals and the nine Justices of the Supreme Court of the United States.

■ In a federal court, a federal judge is free to comment upon the evidence, provided he makes it quite clear to the Jury that any comment made by the Judge is not binding upon the Jury, and it may turn out as I go along in this case that I will make some reference to what I recall as having been the testimony, and how I appraise it and analyze it.

Let me in the most emphatic terms say to you that anything which I say with respect to my recollection of the testimony is not binding upon you. It is your recollection that governs. Let me make it also perfectly plain that anything I say by way of analysis or appraisal of the facts, or of the witnesses, or of any other aspects of the testimony, is not binding upon you.

I hope you will believe that neither by any tone of voice nor by any indication of my head or any gesture or in any other way am I trying indirectly to convey anything to you. Those of you who have been sitting with me for some weeks know that if I want to say something I will say it very plainly and very directly, and do not suppose for a moment that if I wished to convey anything to you I am going to resort to any subterfuge. I am going to do it in the most conspicuous way on the record if I do it.

Many of you, having sat in earlier cases, have heard me give you some general advice with respect to how to weigh the testimony of a witness, and this general advice is just as appropriate in this case as in the other cases in which you have sat. To some of you I have already repeated the famous advice which Mr. Louis D. Brandeis gave in the Balinger Investigation to the Senate Committee, sitting during the Presidency of William Howard Taft.

At that time, in substance, Mr. Brandeis said, "Persons who have to weigh testimony would do well in examining a particular witness to consider four separate items: First, what was his opportunity to observe? Second, what is and has been his capacity to remember? Third, what is his capacity to narrate or recount what he has observed and remembered? And fourth, what is his total comprehension of all the surrounding circumstances which enables him either correctly or incorrectly to place his particular detailed knowledge in the whole picture? And with some presumption I have added a fifth probable test to be used, and that is: to what extent has the man bias or prejudice, self-interest or lack of it, which one either takes into account or uses as a basis of discount?

■ Now in looking at the testimony in a case of this sort, there is no rule whatsoever which requires a jury to give preference to written testimony or to printed testimony as distinguished from oral testimony. It is entirely up to the jury whether they regard particu-

lar items as more or less credible, quite apart from whether the testimony is written or oral.

■ In this case, unlike any others on which you twelve persons have served with me, there has been taken down a daily transcript, which has been reported on a daily basis, and I have before me the three volumes of the transcript of the oral testimony. To underline the fact that there is no difference, as a matter of law, between oral testimony and written testimony, in this case, when I send you out I am going to send you out not only with the pleadings and with the exhibits but with the three volumes of the transcript of the oral testimony. You will have realized that I did not allow any bench conferences to take place, except with one or two very minor exceptions, and so there is nothing confidential in these three volumes. But let me say to you that it does not follow that the three volumes are absolutely accurate. With all due regard to Mr. Duffey, the court reporter, and his associates, they may not always transcribe with one hundred per cent accuracy what was said, and you are not required to accept their transcript as distinguished from your recollection. It may be that on a particular point or points the twelve of you, or the majority of you, will recall the matter differently, and certainly you are not bound to accept the particular version which has been typed out.

In this case, unlike most cases in which you have sat, I have put to you for your consideration a so-called special verdict, a series of four questions, of which the fourth has the subdivisions (a), (b), (c), and (d). The reason I have done this, as I already explained to you, is in part because there are difficult questions of law which can be more readily segregated and considered by an Appellate Court when I submit a special as distinguished from a general verdict. Also, quite candidly I may say that in a case where there are risks of emotion, a special verdict is more of an admonition to the jury: watch carefully and reason accurately according to the stages of the Charge and of the arguments rather than at-large on the basis of passion. The issues which are submitted to you in these questions were worked out yesterday afternoon and have been in the hands of counsel overnight and, as you observed, they addressed their arguments to those issues, which of course I read to you at 9 o'clock, and on which I shall say more later.

Before, however, I come to these particular questions, let me say something quite at-large about the law of libel and about the problems of what may be called choice of law or, as the lawyers denominate it, conflict of laws, so that you may have a better understanding of these questions which are going to be put to you for your verdict.

Speaking very loosely, and subject to a more extended exposition later, let me state to you that in general the law of libel is somewhat to this effect: if a person, directly or indirectly, through an agent or officer or employee, makes a statement in writing, or in print, or in other durable form, which holds another person up to hatred, contempt or ridicule by any substantial portion of the community, the person who makes that statement has made a prima facie defamatory statement which is libelous. A person who has made such a statement may in most communities defend himself entirely if he bears the burden of proving that the statement is true. That is to say, he escapes any responsibility if by the preponderance of the credible evidence, by what the jury believes, he shows that the statement is true.

■ Although this is in general in most communities the rule, it does not happen to be the rule in the Commonwealth of Massachusetts. In the Commonwealth of Massachusetts, the rule is that if a statement is defamatory but true, the defendant still is responsible if the plaintiff, the complaining person, bears the burden of proving by a preponderance of the credible evidence that the defendant was actuated or motivated by what the statute calls "actual malice."

■ Now actual malice, as I already indicated in some earlier remarks, is a phrase of art, a skilled phrase which has to be defined for you. Actual malice does not mean negligence. It means something much more serious. It means, as I said to you earlier, in Justice Holmes's phrase, "disinterested malevolence." Malevolence means wickedness, spite, bad will. And disinterested means without any purpose or interest to serve.

■ In short, it is not actual malice if a person negligently makes a false statement or a true statement. It is not actual malice if somebody makes a statement to serve an interest or purpose which he legitimately has. Thus, and this is of importance, if a person makes a true defamatory statement in bona fide pursuit of an honorable political purpose, he cannot be found to have actual malice.

Actual malice means from the point of view of other people senseless spite, a desire to inflict pain in almost a Jesse Pomeroy fashion, for the sake of making somebody else squirm.

I have already said to you that this is a peculiarity of the law of Massachusetts and I, therefore, find it necessary to tell you that we are not here in my view concerned only with the law of Massachusetts, although we are in part concerned with the law of Massachusetts.

I am now going to give you a little explanation which, I may tell you, you can safely forget once I have given it to you. You will realize, of course, that the Boston Herald-Traveler circulates the Boston Herald not only in Massachusetts but in other New England states and elsewhere. Testimony was given to that effect, and nobody doubts it. We, therefore, have a problem of what is called multi-State libel. That is to say, the defamatory statement, if it was defamatory, circulated in a number of different States, and a very difficult issue arises as to what is the law applicable when an action of a defamatory or alleged defamatory kind occurs simultaneously or virtually so in a number of different jurisdictions.

■ Being a Federal Judge, I am required in a so-called diversity jurisdiction case to apply the law which the Supreme Judicial Court of Massachusetts would apply to this case, and the researches of counsel and of myself persuade me that the Supreme Judicial Court of Massachusetts has never actually decided the problem which I must face, and so I must speculate as to how that court would decide this problem of choice of law, and I have come to the conclusion that in a case where admittedly plaintiff is a citizen of Maine and has professional opportunities there, and was under consideration with respect to an office in the District of Columbia, to wit, the position as counsel for the McCarthy Committee, and when a publication occurred in Boston with the intent on the part of the publisher that it should be read outside of Massachusetts as well as in Massachusetts, and not, least of all, should be read by the Senate Committee in the District of Columbia, I have concluded that under these circumstances it is necessary to take into account not merely the law of Massachusetts but also the law of Maine and the law of the District of Columbia. I have tried to word the special questions to you in a way which will preserve the rights of all counsel with respect to the subtleties and difficult questions, without perplexing you with all the vagaries and varieties incident to the problem of conflict of laws. Having given you this explanation, I will tell you you are now free to forget the last paragraph or two which I have just included in my Charge.

Now let us turn more particularly to the questions designed to get from you responses of fact adequate for the entry of a judgment one way or the other, and adequate for review if review occurs in this case. Whatever may have been the broad scope of the pleadings originally, the nature of the evidence and the nature of the arguments addressed to you permit me to say that you now are concerned with specific parts of this editorial of Friday, the 6th of August, 1954,

and need not really worry about all aspects of it.

Your attention was specifically called to the heading of the editorial which, as you will see when you go out, uses the words "Cohn To Brewster?" and you then had your attention called specifically to one paragraph with respect to Lieutenant Shimon, and your attention was called to a following sentence or two with respect to Senator Bailey, I shall read those to you in a minute, and let me point out to you that in considering them, and as to whether they are true, you are to look at the sentences as a whole, but not necessarily to take into account any minor discrepancies as, for example, we all know, all of us, that by "inadvertence" the wrong year is used in talking about the conduct of Lieutenant Shimon. Whatever he did, he did about the 23rd of July, 1947, and not 1946. But no significance whatsoever is to be attached by you or me to that one year discrepancy.

Now the first part here is the paragraph which is the fifth in the editorial, and it reads as follows:

"In 1950 a lieutenant of the District of Columbia police testified before a Senate group that he had been hired in 1946 by Brewster to tap phones leading into the rooms of employees of Howard Hughes, the millionaire airplane builder. Mr. Hughes was then under investigation by Brewster's Senate war investigating committee."

There follows another paragraph:

"Another witness testified that the police lieutenant had also tapped the phones of the late Senator Josiah Bailey, back when Bailey was chairman of the Commerce Committee."

Now you will recall that, so far as Mr. Alden Hoag, the now chief editorial writer of the Boston Herald-Traveler, could recall when he was on the stand, there is nothing in the actual testimony given in 1950 by Lieutenant, as he then was, or Captain Shimon, "that he had been hired in 1946 by Brewster to tap phones."

Moreover, I declined to allow the admission of the total testimony before that Senate group because my examination persuaded me that there was no evidence that I could let you see on which you could properly form an opinion that the Lieutenant had testified before that group that he had been hired in 1946 by Brewster to tap phones. Mind you, I didn't say there was no evidence to support the claim of the defendant. I merely said that there was nothing in the testimony before the Senate group which supported the defendant's defense on that point.

Now let me call your attention to something which, I am sure, you have very well in mind, that what is said here is to the effect that Senator Brewster hired Lieutenant Shimon to tap phones, and I think you will undoubtedly come to the conclusion that the fair construction of those words is that the Senator hired the Lieutenant for the purpose of tapping phones.

 Now the initial question, as you will recall, when you look at the sheets, which you have to face is: does this statement hold plaintiff up to hatred, contempt or ridicule? When a defendant charges a plaintiff with a crime the jury must, not may, must conclude that the defendant is holding the plaintiff up to hatred, contempt or ridicule. In short, for a defendant to charge a plaintiff with a crime is, to use the language of the law, to charge him with something which is defamatory per se, by itself, without considering anything else. It is defamatory to say that a man has committed a crime.

Does this article charge Senator Brewster with a crime? You, I think, will recall that when he was on the stand, Mr. Alden Hoag, in response to a question put by Mr. St. Clair, said, "It does charge Senator Brewster with a crime." And I instruct you as a matter of law that for someone in the year 1947 to tap the telephone of someone else in the District of Columbia, without authority from the person whose wire is tapped, and without authority from some court

or other body vested with adequate power, is a crime. It is not merely a violation of somebody's Constitutional privileges. It is a crime. So if you construe this editorial, as its author construed it, you can hardly avoid answering the first question "yes." That is, the defendant's editorial did hold plaintiff up to hatred, contempt or ridicule.

I now come to the second question: "If you have answered 'yes' to Question 1, then was the part of the editorial which held defendant up to hatred, contempt, or ridicule true?"

It was argued to you, and I think with considerable good sense, that this is the nub of the case. Did Senator Brewster hire Lieutenant Shimon to tap wires? Did he employ the Lieutenant? That is, did he hire him? And if he did employ him, did he do it for the purpose or with the contemplation of wire tapping?

Now the first problem with which you will have to wrestle is whether in any real sense the Senator did hire the Lieutenant. There can hardly be any question that the Lieutenant's normal salary was paid by the District of Columbia, the Metropolitan Police, and that the Lieutenant was assigned to the staff of the District Attorney. There can hardly be any question that all the expenses incidental to the technical operation of buying wire tapping devices or buying batteries and the like were borne by some public authority in the District of Columbia. There can hardly be any question that there were additional expenses in connection with hotel rooms. Was there any evidence that the Senator in advance agreed to pay those, or indicated in any way that he would pay those, or that he incurred any legal, moral or other obligation with respect to those?

Or, on the contrary, was the situation one when, after the whole enterprise was over, and the Lieutenant had laid out the money wtih respect to the hotel bills, he came around and asked who should pay for them? And at that stage, for one reason or another, Senator Brewster put money in cash in an envelope, gave it to his secretary, Mrs. Dustin, who in turn gave it, perhaps out of obligation but perhaps not out of obligation but merely just to cover a situation not foreseen, to the Lieutenant.

Now let us look at the question as to whether or not Lt. Shimon was brought in contact with Senator Brewster for the purpose of, or with the expectation of, wire tapping. Remember that the burden of proof with respect to the truth of the defamation is upon the defendant. The defendant must persuade you that the statement is more probably true than not. And has the defendant borne this burden?

Senator Brewster testified that there was no discussion of wire tapping. Lieutenant Shimon testified there was no discussion of wire tapping. Both the Senator and the Lieutenant gave a story about how the Lieutenant came into the scene, which would indicate, if you believe it, that Senator Brewster was being shadowed, and that he referred to the matter in the conversation with Senator Bridges, that Senator Bridges got in touch with somebody, and that as a consequence Lieutenant Shimon showed up in Senator Brewster's office, and at that time various matters were discussed, such as who was in the corridor and what was the nature of the report with respect to the shadowing.

But there is no testimony whatsoever by anybody that wire tapping was contemplated. Quite properly your attention was drawn to the fact that we do not have here in any form the testimony of Senator Bridges, so you have no basis on which to suppose that Senator Bridges foresaw wire tapping.

Can you say that the defendant has borne the burden of proving to your satisfaction that Senator Brewster, when he was in touch with Lieutenant Shimon, on or about the 23d of July, 1947, understood, without making specific reference to it, that the Lieutenant was going to engage in wire tapping? The argument which is presented to you, and the kind of testimony which was offered to you by the defendant, did, I think, rather on this basis than any other. It is that the

man from Maine, Senator Brewster, was not exactly unsophisticated. He had been around Senate investigations, and he knew about the local District of Columbia police. Indeed, he has served on a committee at one time in Congress which had supervision over the police. And the suggestion is that his prior experience was such that he knew that if you handed a matter over to the police, you were authorizing a policeman to whom you handed it over, directly or indirectly authorizing him to conduct wire tapping on your behalf.

The suggestion in short is that a man who is sufficiently knowing knows enough not to say too much. What he does is, he brings in a fellow whose general qualities and skills are known to him, and he protects himself by saying nothing.

Well, that is a plain jury question. And do not think that I, by reciting this contention, adopt it or reject it. I am merely trying to point out to you what I understand to be the drift of the contention with respect to the alleged truth of the defamatory statement, if it was defamatory.

I now turn to Question No. 3: "If, but only if, you answered "Yes" to Question 2, then in your opinion was the defendant motivated by actual malice toward the plaintiff?"

■■■■ The burden of showing actual malice is on Mr. Brewster, not upon the Boston Herald-Traveler. And the question is whether you are persuaded by the preponderance of the credible evidence that Mr. Hoag, acting for the Boston Herald-Traveler, was malevolent in a way which can be described as disinterested or spiteful. Whatever you think of the carelessness of charging somebody with a crime on the basis of 2½ or 3 hours of research, and whatever you think of the good sense of relying upon a previous editorial in the Washington Post, whatever you may think of the good sense of relying upon an article in a magazine known as The Reporter, are you prepared to say that Mr. Hoag was more than negligent? He may have been negligent.

And you may think that it is mighty careless for somebody to go into print, charging somebody with a crime, without bothering to talk either with the individual concerned or with other persons supposed to have collaborated, or with anybody in Washington, D. C., who represents the Boston Herald-Traveler, or without looking at the actual transcript of the testimony before a Senate Committee. But mere negligence is not actual malice.

Actual malice means personal spite. And what is there really that justifies the suggestion that Mr. Hoag had that kind of attitude? It would appear that he was not exactly a political supporter and partisan of Senator Brewster. And, even if he worked for a Republican newspaper, he may not have been a Republican, himself. And he may have had many wishes to say something about the Senator some day, and about the McCarthy Committee, and about Roy Cohn and about a lot of other things which he felt about quite warmly. But was his object on that day spiteful or, on the contrary, was his object and his attitude of mind a perhaps misguided conviction that it was for the public good that Senator Brewster should not be appointed?

I now turn to Question 4: "If you have answered Question 1 in the affirmative [that is, if you have found that the editorial in whole or in part held the plaintiff up to hatred, contempt, or ridicule], and if you have either answered 'no' to Question 2 [that is, you have found that the editorial was not true] or you have answered 'yes' to Question 3 [that is, you have found that the defendant was motivated by actual malice] then proceed to answer each of the following four subdivisions lettered a, b, c and d."

Now you obviously have to answer this fourth question only if you have found that the article was either false or malicious. If you have found that it was both true and in good faith you never have to consider a, b, c and d. I have already pointed out to you that with respect to a, b, c and d you are not to attach any significance to the fact that in the brack-

eted material following each of the paragraphs a, b, c and d I have put the word "no" first as one of the alternative forms of answer. The only reason I have put the word "no" first is it is the shortest word in the bracketed material and can be most readily understood if put first. It does not indicate my view at all.

Now the first of the four sub-paragraphs reads as follows: (a) Did the editorial cause plaintiff to lose the opportunity to serve as counsel for the so-called McCarthy committee, and, if so, what financial damages did plaintiff suffer directly or indirectly as a result of such lost opportunity? [Answer either "no" or in dollars.]

You will remember, because I have restated it several times, that the editorial was published on a Friday, August 6, 1954. You will recall the deposition of John Fitzgerald Kennedy, Senator of the United States, to the effect that he knows a poll was being taken that week. Mr. Hall, in his argument, conceded that the poll was not completed until noon of the 6th of August, that Friday. I don't know whether that concession does or does not go beyond the record. All I can say to you is that my recollection is the poll was going on during the whole week, and I don't know when all the votes were in. I think it began on the 4th of August, which would have been Wednesday.

It is quite plain that there were editorials: J-1, J-2 and J-3; that is to say, the article by Doris Fleeson, the editorial in the Post and the news article in the Post earlier in the week, which were hardly complimentary of the plaintiff.

Now the question here is: if this were a defamatory, false article, if you have so found it, was it the operative cause, the effective cause, the legal cause of the failure of the McCarthy committee to appoint Senator Brewster?

The plaintiff, Senator Brewster, has the burden of establishing the damages. And has he persuaded you by a preponderance of the credible evidence that this particular editorial published in Boston on the morning of Friday, the 6th of August, was the cause, or a substantial cause, of the failure of the Committee to appoint him?

The one Massachusetts member of the Committee, Senator Kennedy, certainly was not affected by it, because his testimony, if you believe it, is that long before that editorial appeared he was against the appointment of Senator Brewster. No doubt the Boston Herald-Traveler is an eminent publication. Is it credible that most Senators read it at once, within six hours after its publication or within twelve hours after its publication in Boston? It is up to you. If you think that that editorial was the cause of the failure to appoint the Senator, then you are to take into account the damages, direct and indirect, which flow from it.

It seeems to be agreed that the appointment carried a salary of around $11,000 and a little more per year. Quite correctly it has been pointed out to you that just in financial terms, that salary is no indication of what the value of the job is. Who knows better than Mr. St. Clair, who was assistant to his senior partner, Mr. Joseph Welch, who was of counsel before this very committee? I would have no doubt whatsoever, and I would suppose you would have none, that appointments to a public office, which carries an $11,000 salary, may be very valuable, and particularly may be very valuable to a man who is trying to regain his footing in the law after having been for some time in public office of another kind. So that if you do find that in fact this editorial was the cause for Senator Brewster not being hired, I would think you might reach a very substantial sum of money as being appropriate. But I am not suggesting to you that you will answer this question in dollars rather than answering it "no". It is up to you.

The next sub-paragraph is (b): "Did the editorial cause plaintiff to lose money in the practice of law in Maine, and, if so, what financial damages did plaintiff suffer directly or indirectly as a result of

such lost opportunity? [Answer either 'no' or in dollars.]"

Well, the first problem you have to face is: was the editorial read in Maine? Of course, the editorial was circulated there. Was it read by people who were potential clients? Were they affected by that in withholding what they might otherwise have offered in the way of legal business to Senator Brewster? How alert and receptive was he at that period of time in connection with legal business?

He has told us he remained in the same office building, the same suite of offices, in Bangor or thereabouts, which he had at the time he was a Senator, but he didn't put out a sign saying Ralph Owen Brewster or Owen Brewster, Attorney-at-Law. He does not appear to have been addressing Bar Associations, but he was addressing Boy Scouts. It is admirable to address Boy Scouts, but they are not Chambers of Commerce, they are not Rotaries. The subtle rapture of a postponed client is quite postponed in the case of a Boy Scout. Even a contributor to Boy Scout organizations is perhaps not the kind of person whom one addresses when one's object is to increase one's legal business, or so you might think.

At any rate, was the plaintiff looking for much legal business, or was he in some other way that we don't know of adequately provided for so that he was not really feeling very much pinched on the $4,000 or $5,000 he was getting a year out of the legal business?

It may very well be that a Law Review Editor at Harvard 40 years out is still a pretty good lawyer. It may be that a man who has served in the United States House of Representatives and in the United States Senate has a legal advantage, a strictly professional knowledge, useful in administrative and legal circles, quite the equal of any lawyer who has spent his time on probate matters and conveyancing. But was it Senator Brewster's attitude that he was trying to capitalize on this knowledge, and that

he was being interfered with by this editorial?

I now turn to the third sub-paragraph (c): "Did the editorial cause plaintiff to sustain loss of reputation (aside from professional opportunity) and mental pain and suffering, and, if so, in what dollar amount? [Answer either 'no' or in dollars.]"

Well, the problem of reputation is, of course, an extremely difficult one, and we are here dealing with, as you will realize by my exclusion in the parenthesis, not with the reputation for law. That is covered in the preceding situation where all professional damages are taken care of, if any are recoverable. But the question is one of personal reputation.

Now no Judge of any experience thinks he knows better than a jury about matters of this sort. If I had any doubt, I had a good lesson once. There was a moving picture, which some of you may have seen, called They Were Expendable, produced by Metro-Goldwyn-Mayer, I guess, and it was based upon a book written by the son of William Allan White, and it dealt with the activities in the Korean War, and the motion picture showed an extra-marital affair between a man and a woman, a sailor and a nurse. The sailor tried the case before me without a jury, and the nurse tried the case before a jury in Missouri. Something may have turned on the difference in the sexes of the two plaintiffs. The same incident was involved. The loss of reputation to the plaintiff before me, Lieutenant Kelley, was valued by me at $3,000. The loss of reputation by the nurse was valued by the Missouri jury at $250,000. I may say, the jury verdict was cut down on appeal. But it has taught me that I know nothing which is like that which is known by a jury with respect to questions of the value of reputation. And perhaps this is something as to which I ought not to say any more than that I hope you will bear in mind that here, as everywhere else, you are not to exercise a political judgment but the best judgment you can in a very difficult situation, if you reach the point.

As to mental pain and suffering, this is also a very difficult issue indeed, if you reach it. The law says that if a false defamatory statement is made about you, or a true defamatory statement is made about you by a defendant motivated by actual malice, you are entitled to recover your pain and suffering. Your pain and suffering is not only your own immediate discomfort. It is the pain you have from seeing members of your family suffer because of the attack on you. And in this connection, all that I can say is that no dollar and cents amount really makes much sense. Sir Patrick Hastings, the most experienced libel lawyer that this century has produced, who tried dozens of libel suits, said, "The question is: does the jury like the plaintiff?"

Well, that really isn't the question. And you must not allow your emotions to run away with you, either in favor of or against the plaintiff. You are to take into account, of course, the kind of quality and character that the plaintiff has, and his susceptibility.

Last week, in England, the son of Sir Winston Churchill, Randolph Churchill, brought suit against somebody who had called him cowardly—not cowardly because he was lacking in physical courage, but cowardly because he had in an editorial or set of articles attacked Sir Anthony Eden with respect to the Suez crisis, and it was thought to be cowardly that Churchill had attacked Eden under circumstances where Eden couldn't reply because Eden could not disclose the confidential matters before the British Cabinet.

It was found by the jury that the charge was without basis, and the plaintiff got a verdict of 1500 pounds, or $4500. You are not controlled by what the English do. Far from it. But I think it is sometimes helpful for a jury to realize how other jurors act in situations which might loosely be thought by them to have some bearing upon the matter.

Now I am coming to the next question, which is: "In your judgment is the plaintiff entitled in addition to the so-called compensatory damages covered in the paragraphs a, b, and c above, also entitled to so-called punitive damages designed to punish defendant on account of any recklessness or malice that it, its officers, agents or employees may have had toward the plaintiff in connection with the publication of the editorial of August 6, 1954, and, if so, in your opinion what would be the appropriate amount in dollars of such punitive damages? [Answer either 'no' or in dollars.]"

Well, I am not trying to tell you whether or not there were punitive damages. If you have found that Mr. Hoag was malicious, that is to say, he had actual malevolence, then you are entitled to punish him, that is to say, his employer, the Boston Herald-Traveler.

You may take into account your whole views of social policy with respect to that. That is, your views with respect to freedom of the press, and abuse of freedom of the press, the degree to which public figures are properly subjected to some kind of risk, and the degree to which newspapers are properly held up to a high standard so that we may be informed justly and accurately of facts, whatever may be said about comment.

On all problems of punishment, whether by a Judge or by a jury, the latitude is enormous. If you reach this question, there is very little I can say to you by way of guidance. You will bear in mind that the testimony which has been admitted over the last three days is voluminous. You will realize that some of it has been admitted for very limited purposes.

Let us, for example, take the sort of items which were covered in the exhibits, which were the Washington Post editorial, or, The Reporter article, or Doris Fleeson's column. Now you must not suppose that any of those items were admitted for the purpose of showing the truth of the matter. That is to say, they were not admitted for you to take into account in determining whether or not in fact and in truth Senator Brewster hired Lieutenant Shimon to tap wires.

Those are inadmissible for the purpose of considering the truth. You are to consider the truth on the basis of the other direct evidence and proper inferences from the direct evidence.

Those articles were admitted for one of two other purposes, or several other purposes. They were admitted, in the case of The Washington Post editorial and in the case of The Reporter editorial, which were respectively Exhibits 1 and 2, for the purpose of showing what was available to and used by the editorial writer, Mr. Hoag, when he wrote his article.

Other items, Exhibits J–1, J–2 and J–3, that is to say, the articles which appeared during the week prior to August 6, 1954, were introduced for the purpose of showing that even if this editorial of the 6th of August, 1954 was defamatory, it was not the cause, but something else was the cause, of the non-employment of Senator Brewster by the Senate Committee.

And other editorials and articles, in Bangor and elsewhere, the Bangor Commercial, and the little paper in Fairfield, were referred to for the purpose of showing, if they did show, that the Senator had become inured, hardened, so that he did not suffer much, that he was the kind of man who had been able to remain in politics by developing a thick skin. Not all men in politics develop a thick skin. You will remember President Hoover's hair shirt to protect what he regarded as a thin skin.

At any rate, these are questions of a sort on which a jury must exercise its judgment. I hope you will have the feeling that in this case you can act quite apart from any political consideration. There is great reason to have faith and confidence in a jury even in a political case. When Theodore Roosevelt, having been President of the United States, was falsely charged again and again with being a drunkard, he brought a suit for libel and sought 6 cents, a farthing, and he persuaded the jury and got his farthing.

You are not to hold it against Senator Brewster or his counsel that he thinks his reputation and his financial losses and the like entitle him to damages of $250,-000. If he is entitled to prevail, he is entitled to whatever are just compensatory damages and just punitive damages, if you think punitive damages are recoverable as well as compensatory damages.

I hope you have the feeling that as you go out to the jury room you are engaged in a more than usual solemn proceeding. Every time a man's money or his property is at stake, of course he cares about getting a fair shake. But when there is at stake his reputation, he has that kind of concern which he has when his liberty or his life is involved. You are to return a true statement to the questions submitted to you.

Is there anything else, gentlemen?

### Opinion.

The question has arisen in this case as to how a jury should be instructed in connection with a multi-state libel.

This is a suit founded upon the diversity jurisdiction of this Court. Plaintiff is a citizen of Maine who is a member of its bar, and was formerly its Governor, one of its representatives in Congress, and one of its United States Senators. So far as appears, he has practiced law only in Maine, and perhaps in the District of Columbia. Defendant is a Massachusetts corporation publishing a newspaper which has its largest circulation in Massachusetts, but which circulates to a considerable extent in Maine to a much smaller extent in the District of Columbia, and to some degree in other parts of the country.

In August 1954 plaintiff was under consideration as a possible appointee as counsel for the so-called McCarthy Committee, more technically known as the United States Senate Committee on Government Operations. This committee functioned principally in the District of Columbia and all its actions in appointing persons as its counsel were taken in the District of Columbia.

While the Senate Committee was considering whether to appoint plaintiff, defendant published in the Boston Herald of August 6, 1954 an editorial charging plaintiff with the crime of wiretapping and urging that on that as well as other grounds the Senate Committee should not appoint him as its counsel.

For this defamatory statement plaintiff has brought in this Court a suit for libel seeking to recover both compensatory and punitive damages.

It is undisputed that in Maine and in the District of Columbia truth would be an absolute defense to a statement that was prima facie defamatory.

It is also undisputed that in Massachusetts truth is not a defense if the plaintiff proves that the defendant was motivated by actual malice.

Furthermore, it is clear that under the law of Massachusetts a successful plaintiff recovers merely compensatory damages. Under the law of Maine and of the District of Columbia a plaintiff may recover punitive damages as well as compensatory damages.

Sitting as a federal judge in a diversity jurisdiction case, I am required to follow the choice of law rules laid down by the Massachusetts Supreme Judicial Court. However, no case in that court has enunciated rules with respect to multi-state libels.

In diversity jurisdiction cases, my own practice, that of other judges in this District, and that of various courts of appeal would support conflicting theories.

Perhaps, however, none of these cases has so clearly presented a situation in which a defendant made a defamatory statement with the specific object of effecting a result in a place other than that where the defamatory statement was published or principally circulated. In short, the presence of the District of Columbia as the chief intended place of impact of the libel in this case distinguishes the situation at bar from any other that has arisen in any case known to me.

Moreover, in this case, unlike most cases known to me, the plaintiff will suffer a very large part of his damages, if any, not in the state of principal publication but in his own home state, the state of his principal professional and political reputation, and in the District of Columbia where the Senate Committee ordinarily meets.

It is my view that the Massachusetts Supreme Judicial Court would adopt not a black letter rigid rule of conflict of laws, but would examine the special circumstances of this case and tailor a flexible rule suitable for these facts.

Furthermore, it is my view that, using a flexible test, the Massachusetts Supreme Judicial Court would conclude that under the circumstances at bar plaintiff is entitled to have his claims for recovery treated not globally but severally, state by state.

In short, the parties are entitled to have separate instructions of law, if necessary, and separate calculations of damage, if appropriate, first for the District of Columbia, second for Maine, and third for Massachusetts.

With this in mind I shall present to the jury for its consideration a special verdict in the following terms:

1. Did the defendant's editorial of August 6, 1954, in whole or in part, hold plaintiff up to hatred, contempt, or ridicule? [Answer "yes" or "no". If you have answered this question "yes", proceed to the next question. If you have answered this question "no", stop at this point and return your verdict to the Court.]

2. If you have answered "yes" to question 1, then was the part of the editorial which held defendant up to hatred, contempt, or ridicule true? [Answer "yes" or "no". Whichever answer you give, proceed to answer question 3.].

3. If, but only if, you answered "yes" to question 2, then in your opinion was the defendant motivated by actual malice toward the plaintiff? [If you reach this question, answer it "yes" or "no".]

4. If you have answered question 1 in the affirmative [that is, if you have found that the editorial in whole or in part held the plaintiff up to hatred, contempt, or ridicule,] and if you have either answered "no" to question 2 [that is, you have found that the editorial was not true] *or* you have answered "yes" to question 3 [that is, you have found that the defendant was motivated by actual malice] then proceed to answer *each* of the following four subdivisions lettered a, b, c, and d.

(a) Did the editorial cause plaintiff to lose the opportunity to serve as counsel for the so-called McCarthy Committee, and, if so, what financial damages did plaintiff suffer directly or indirectly as a result of such lost opportunity? [Answer either "no" or in dollars.]

(b) Did the editorial cause plaintiff to lose money in the practice of law in Maine, and, if so, what financial damages did plaintiff suffer directly or indirectly as a result of such lost opportunity? [Answer either "no" or in dollars.]

(c) Did the editorial cause plaintiff to sustain loss of reputation (aside from professional opportunity) and mental pain and suffering, and, if so, in what dollar amount? [Answer either "no" or in dollars.]

(d) In your judgment is the plaintiff entitled in addition to the so-called compensatory damages covered in the paragraphs a, b, and c above, also entitled to so-called punitive damages designed to punish defendant on account of any recklessness or malice that it, its officers, agents, or employees may have had toward the plaintiff in connection with the publication of the editorial of August 6, 1954, and, if so, in your opinion what would be the appropriate amount in dollars of such punitive damages? [Answer either "no" or in dollars.]

[After having presented the above form of verdict to the jury and after having charged the jury, the judge received from the jury an affirmative answer to the first question, a negative answer to the second question, no answer to the third question, and a negative answer to the four parts of the fourth question. Upon this basis the judge entered a verdict for the plaintiff in the amount of one cent.].