**Hammer DeROBURT, President of the Republic of Nauru, Plaintiff,**

v.

**GANNETT CO., INC., a Delaware Corporation, and Guam Publications, Inc., a Hawaii Corporation, both dba Pacific Daily News, Defendants.**

Civ. No. 78–0375.

United States District Court, D. Hawaii.

Aug. 31, 1979.

Joseph T. Kiefer, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, George M. Allen, Majuro, Marshall Islands, Donald C. Williams, Agana, Guam, for plaintiff.

David J. Dezzani, Goodsill, Anderson & Quinn, Honolulu, Hawaii, for defendants.

## ORDER DENYING MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

SAMUEL P. KING, Chief Judge.

This action involves an international defamation suit brought by Hammer DeRoburt, the President of Nauru,[1] against Gannett Co., Inc. [hereinafter "Gannett"], one of the largest newspaper publishers in the United States, and one of its subsidiaries, Guam Publications, Inc., for an article printed in the Pacific Daily News. Gannett is a Delaware corporation with its principal place of business in New York; Guam Publications is incorporated in Hawaii and has its principal place of business in Guam; Hammer DeRoburt is a citizen of Nauru. Jurisdiction is premised upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

The Pacific Daily News is a daily newspaper printed in Agana, Guam by Guam Publications. As the self-proclaimed "Voice of the Pacific," it is the only newspaper providing regular coverage of events in the various islands of the western Pacific, including the Trust Territory of the Pacific Islands,[2] the Commonwealth of the Northern Mariana Islands[3] and Nauru. On May 30, 1978, the Pacific Daily News published an article written by Cisco Uludong, a reporter based in Saipan (the capital of the Commonwealth of the Northern Marianas), that reported a loan transaction between the Marshall Islands Political Status Com-

---

1. Nauru is an independent island nation approximately eight and one-half square miles in area with a population of about 4000 citizens. Because of its vast deposits of phosphate, Nauru is among the wealthiest nations, per capita, in the world.

2. The Trust Territory of the Pacific Islands is one of eleven trusteeships set up pursuant to agreements between the United Nations and various nations after World War II. It is a

"strategic trust" administered by the United States and contains six island districts. *See People of Saipan v. United States Department of the Interior*, 356 F.Supp. 645, 647–48 (D.Hawaii 1973), *aff'd*, 502 F.2d 90 (9th Cir. 1974).

3. The Commonwealth of the Northern Marianas is a commonwealth administered by the United States.

mission [hereinafter "MIPSC"][4] and Hammer DeRoburt as President of Nauru.[5] DeRoburt contends that this article, which reported that he had personally loaned Nauruan funds to the MIPSC,[6] falsely and maliciously accused him of committing serious crimes under the law of Nauru and of interfering with the internal political affairs of the Marshall Islands in violation of accepted standards of international diplomacy and relations.[7] He seeks $1.5 million compensatory and $6 million punitive damages for allegedly being exposed to criticism and ridicule both within Nauru and elsewhere in the world.

Plaintiff filed suit in this Court on October 2, 1978 and amended his complaint on November 29, 1978. Counts 1 and 2 state claims "founded on Nauruan law of libel."[8] Counts 3 through 6, which are replete with the words "actual malice" and "reckless disregard" in describing defendants' alleged conduct, are founded upon American principles of libel law.[9] Defendants have moved this Court to dismiss counts 1 and 2 of the amended complaint and to grant them summary judgment on the remaining four counts.

## MOTION TO DISMISS

■ Counts 1 and 2 of the complaint aver that defendants have defamed Hammer DeRoburt under the laws of Nauru. Thus, this Court is asked to adopt foreign law and apply it to the conduct of two United States corporations. In a diversity case, a federal court ordinarily must apply the choice of law rule of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This rule is applicable herein because of the incorporation of Guam Publications in the State of Hawaii.[10] In this case, however, the resolution of the instant choice of law question is not easily ascertained because the Hawaii Supreme Court has not stated a choice of law rule for defamation cases.[11] Consequently, this Court must apply the choice of law principle it deems most likely to be adopted by the Hawaii Supreme Court in the future. *Keystone Aeronautics Corp. v. R. J. Enstrom*

4. The Marshall Islands Political Status Commission is a statutory body created by the legislature of the Marshall Islands in 1973 to represent the people of the Marshall Islands in the process of negotiation to end the U.S. trusteeship over those islands.

5. At the time the article was written, the political status of the Trust Territory of the Pacific Islands was in the process of change. Its local governmental body, the Micronesian Congress, had devised a Constitution for a Unified Micronesian Nation that was to be voted on by the people of the Trust Territory in a referendum scheduled for July 12, 1978. A significant number of the Marshall Islanders perceived great disadvantage in becoming part of the Nation because the Micronesian Congress had promulgated tax policies detrimental to their interests in the past. For these reasons, the government of the Marshall Islands sought funds to assist the MIPSC in its efforts to gain independence.

6. Plaintiff contends that the loan was actually made to the Marshall Islands legislature by the Republic of Nauru Finance Company, a private corporation created by Nauruan statute.

7. Counts 1, 3 and 5 of the complaint cite Nauru law under which the expenditure of money by DeRoburt as described in the article would al-

legedly violate statutory provisions for the appropriation of public funds and constitute the crime of stealing. Counts 2, 4 and 6 allege the violation of accepted standards of international diplomacy and relations.

8. Plaintiff's Motion for Leave to File Amended Complaint at 1 (filed November 27, 1978).

9. Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Counts 1 and 2 and for Summary Judgment on Counts 3 through 6 at 4 (filed March 16, 1979).

10. This rule might not be applicable in all cases brought in this district. *See, e. g.,* 28 U.S.C. § 91 (1970).

11. In *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967), the Supreme Court stated that

the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving "proper regard" to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court.

*Corp.*, 499 F.2d 146 (3d Cir. 1974); C. Wright, Law of Federal Courts § 59 at 271 (3d ed. 1976).

Both sides contend that their respective positions are supported by the traditional rule of *lex loci delicti.* This rule prescribes the application of the "law of the place of the wrong." [12] Defendants contend that Guam law, which includes First Amendment protection, would be applied under this theory because Guam was the place where publication, the last act necessary to cause liability, occurred.[13] Plaintiff re-

sponded by arguing that "publication" is a term of art in defamation cases which refers to the act of communication to a third party; therefore, because Nauru is the place where the greatest injury has occurred, the law of Nauru should be applied, at least with respect to the publication which took place there.[14] Although it is true that courts have commonly applied this choice of law rule to tort actions in the past, the more recent trend expounded by legal commentators [15] and adopted by a substantial number of courts [16] is to reject the rule

**12.** Underlying the *lex loci delicti* rule is the vested rights doctrine propounded by Professor Beale, author of the First Restatement of Conflict of Laws, and Justices Cardozo and Holmes. This theory holds that a cause of action arises only from the laws of the state in which the actionable conduct took place and therefore only the law of the foreign state can be applied where a wrong has occurred within its borders. *See, e. g., Cuba R. R. v. Crosby*, 222 U.S. 473, 478–79, 32 S.Ct. 132, 56 L.Ed.2d 274 (1912) (Holmes, J.); *Slater v. Mexican Nat'l R. R.*, 194 U.S. 120, 126, 24 S.Ct. 581, 48 L.Ed. 900 (1904) (Holmes, J.).

**13.** The place of the wrong is defined as "the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement (First) of Conflict of Laws § 377 (1934).

**14.** Plaintiff also cited an illustration from the First Restatement which strongly supports his contention.

Summary of Rules in Important Situations Determining where a Tort is Committed

. . . . . .

5. *Where harm is done to the reputation of a person, the place of wrong is where the defamatory statement is communicated.* [Illustration] A, broadcasting in state X, slanders B. B is well and favorably known in state Y and the broadcast is heard there by many people conversant with B's good repute. The place of wrong is Y. Restatement (First) of Conflict of Laws § 377, Note 5, Illustration 7 (1934).

**15.** *See, e. g.,* Cook, *The Logical and Legal Bases of the Conflict of Laws*, 33 Yale L.J. 457 (1924); Currie, *On the Displacement of the Law of the Forum*, 58 Colum.L.Rev. 964 (1958).

**16.** In the landmark case of *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), Chief Judge Fuld of the New York Court of Appeals rejected the traditional rule in a decision that has since served as the signal case for the abandonment of *lex loci delicti* as

the sole rule for the choice of law in tort. The choice of law question in *Babcock* was whether to apply the law of Ontario or New York to a suit brought by a New York wife against her husband for injuries she received while he was driving in Ontario. The Ontario statute prohibited suits brought by injured passengers against their drivers; the New York policy required all tortfeasors to compensate guests for injuries caused by their negligence.

The question presented is simply drawn. Shall the law of the place of the tort *invariably* govern the availability of relief for the tort or shall the applicable choice of law rule also reflect a consideration of other factors which are relevant to the purposes served by the enforcement or denial of the remedy? The traditional choice of law rule, embodied in the original Restatement of Conflict of Laws (§ 384), and until recently unquestioningly followed in this court . . . has been that the substantive rights and liabilities arising out of a tortious occurrence are determinable by the law of the place of the tort. . . . It had its conceptual foundation in the vested rights doctrine, namely, that a right to recover for a foreign tort owes its creation to the law of the jurisdiction where the injury occurred and depends for its existence and extent solely on such law. . . . Although espoused by such great figures as Justice Holmes (see *Slater v. Mexican Nat. R. Co.*, 194 U.S. 120, [24 S.Ct. 581, 48 L.Ed. 900] . . .) and Professor Beale (2 Conflict of Laws [1935], pp. 1286–1292), the vested rights doctrine has long since been discredited because it fails to take account of underlying policy considerations in evaluating the significance to be ascribed to the circumstance that an act had a foreign situs in determining the rights and liabilities which arise out of the act. "The vice of the vested rights theory", it has been aptly stated, "is that it affects to decide concrete cases upon generalities which do not state the practical considerations involved". . . . More particularly, as applied to torts, the theory

in favor of a more modern analysis.[17] Examination of the use of *lex loci delicti* has shown that the rule's mechanical application often has led to unjust results.[18] Hence, the mechanical rule has yielded to one that recognizes the interests of the affected parties and the public policy considerations of the states involved.[19]

 This Court is similarly persuaded that principles of equity require the adoption of an interest-oriented choice of law analysis. Section 6(2) of the Restate-

ignores the interest which jurisdictions other than that where the tort occurred may have in the resolution of particular issues. It is for this very reason that, despite the advantages of certainty, ease of application and predictability which it affords (see Cheatham and Reese, Choice of the Applicable Law, 52 Col. L.Rev. 959, 976), there has in recent years been increasing criticism of the traditional rule by commentators and a judicial trend towards its abandonment or modification. 12 N.Y.2d at 476, 240 N.Y.S.2d at 746–47, 191 N.E.2d at 280–81 (footnotes omitted).

The *Babcock* court "discarded" *lex loci delicti* and relied, instead, on the principles enumerated in the Second Restatement of Conflict of Laws.

According to the principles there set out, "The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort" (Restatement, Second, Conflict of Laws, § 379[1]; also Introductory Note to Topic 1 of Chapter 9, p. 3. [Tentative Draft No. 8, 1963]), and the relative importance of the relationships or contacts of the respective jurisdictions is to be evaluated in the light of "the issues, the character of the tort and the relevant purposes of the tort rules involved" (§ 379[2], [3]).

12 N.Y.2d at 479, 240 N.Y.S.2d at 749–50, 191 N.E.2d at 283–84. *Babcock*, however, was not a clear endorsement of a specific choice of law rule. At the time of the decision, two policy-oriented substitutions for the traditional rule had emerged from the legal literature. Professor Reese, reporter of the Restatement Second, advocated the "most-significant-contacts test." He proposed that a variety of "contacts" be examined so as to apply the law of the state having the most significant relation to the case. *See* Cheatham and Reese, Choice of the Applicable Law, 52 Colum.L.Rev. 959 (1952). Professor Brainard Currie, the leading exponent of "interest analysis", argued that choice of law rules that pointed to a particular jurisdiction were unacceptable. He recommended that the underlying policies of the laws of the different states be analyzed to ascertain which state had the greatest interest in the action before the court. B. Currie, Selected Essays on the Conflict of Laws 52 (1963). Both Reese and Currie claimed *Babcock* supported their respective positions. *Comments on Babcock v. Johnson, A Recent Development in Conflict of Laws*, 63 Colum.L.Rev. 1212, 1235, 1253 (1963).

For a list of decisions adopting a more modern choice of law analysis in tort cases, see R. J. Weintraub, Commentary 234–37 (1971).

**17.** The limited utility of *lex loci delicti* was explicitly recognized by the Supreme Court in *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), a multistate tort action brought under the Federal Tort Claims Act. The Court there noted that a federal court, when interpreting state law, need not follow the *lex loci delicti* rule "in those situations where its application might appear inappropriate or inequitable [to the state court]." *Id.* at 13, 82 S.Ct. at 593.

**18.** An oft-cited example of an inequitable result mandated by the *lex loci delicti* rule is *Landers v. Landers*, 153 Conn. 303, 216 A.2d 183 (1966). In that case, a Connecticut resident sued her husband, who was also a Connecticut resident, in a Connecticut court for injuries sustained as a result of his grossly negligent driving in Virginia. The Connecticut Supreme Court affirmed the trial court's ruling that Virginia's rule of marital immunity disallowed the wife's suit.

**19.** Different choice of law theories have been used to apply public policy to choice of law problems. Originally, public policy constituted grounds for the courts to dismiss actions they were otherwise bound to enforce under the vested rights theory. *See, e. g., Union Trust Co. v. Grosman*, 245 U.S. 412, 38 S.Ct. 147, 62 L.Ed. 368 (1917); *The Kensington*, 183 U.S. 263, 269, 22 S.Ct. 102, 46 L.Ed. 190 (1901). A significant number of courts and legal commentators have since rejected the vested rights doctrine in favor of the "local law" theory. This theory holds that foreign law is not applied as a foreign cause of action, but rather is adopted as a rule of decision by the forum court. "The forum thus enforces not a foreign right, but a right created by its own law." Cavers, *The Two "Local Law" Theories*, 63 Harv.L.Rev. 822, 824 (1950). Consequently, the local law theory recognizes public policy as a factor in the initial determination of what law to apply.

Two general choice of law rules have arisen from the local law theory: the "most significant relationship" rule and "interest analysis". *See* note 16 *supra*.

ment (Second) of Conflict of Laws provides a list of factors helpful to the Court's identification of interests that are determinative of the appropriate choice of law.[20] Defendants rely on these principles to assert that Nauru is not "the state of most significant relationship" to the instant action,[21] and that only the law of Hawaii or Guam can be applied. This Court's analysis of two of the relevant principles enumerated therein indicates that a different result than simply the application of one state's law may be warranted.

■ The first pertinent consideration concerns the "relevant policies of the forum."[22] It is the policy of the forum state and Guam that critics of public officials and public figures receive the protection afforded by the First Amendment. The importance of this policy cannot be overstated. It is a principle fundamental to our system of constitutional democracy "that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). To insure the vigorous, candid and unfearing disclosure of information concerning public officials, the Supreme Court held that the alleged defamer of a public official enjoys the constitutional protection of the "actual malice" standard which requires a public official suing for defamation to show that an allegedly defamatory remark relating to his official conduct was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726.[23] This requirement was subsequently extended to defamation suits brought by "public figures." *E. g., Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87

**20.** § 6. Choice-of-Law Principles
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

**21.** The Second Restatement combines the "state of most significant relationship" analysis of Professor Reese with Professor Currie's "interest analysis". Thus, under the Second Restatement, the applicable law depends upon (1) which state has the most contacts with the action and (2) which state has the greater public policy interest in having its law applied. *See* R. C. Cramton, D. P. Currie, H. H. Kay, Conflict of Laws 203–04, 306–07 (2d ed. 1975) The number of contacts a state may have with an action is treated as one of a number of relevant factors to be considered in its interest analysis, rather than as a separate choice of law rule to be given effect in all cases. Such an approach is consistent with the purpose of identifying determinative interests in a choice of law problem. It permits the cataloguing of contacts between states to effect a choice of law only when a determinative interest is thus revealed.

**22.** Restatement (Second) of Conflict of Laws § 6(2)(b) (1971).

**23.** Actual malice is a First Amendment rule devised to protect critics of public officials for the reason that "[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). The protection is not, however, without limits.

> The fact that dissemination of information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity does not mean . . . that one may in all respects carry on that activity exempt from sanctions designed to safeguard the legitimate interests of others. A business "is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others."

*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 150, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967) (quoting *Associated Press v. NLRB*, 301 U.S. 103, 132–33, 57 S.Ct. 650, 81 L.Ed. 953 (1937)).

S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *see Time, Inc. v. Firestone*, 424 U.S. 448, 453, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The English common law of libel adopted by Nauru contains no such safeguards; except for this dissimilarity, however, the policies underlying laws of defamation in Hawaii, Guam and Nauru do not, at this time, appear to conflict. The libel laws of the respective states represent a common commitment to protecting the reputations of their citizenries. Hence, application of the libel law of Nauru together with the First Amendment safeguards of *New York Times v. Sullivan* and its progeny would provide a satisfactory accommodation of the relevant policies of this forum.[24]

 The second relevant consideration pertains to the "justified expectations of the parties."[25] The Second Restatement explains that the "expectations of the parties is a pertinent consideration when a party has justifiably conformed its conduct to the laws of a particular state."[26] In this case, defendants allege that they have printed the Pacific Daily News with the expectation that their freedom of expression will be protected in United States Courts; they contend that such protection is available only under the libel laws of Guam or Hawaii. As noted earlier, this Court believes that the public policy of the United States requires the application of the First Amendment to libel cases brought in the courts of this country; defendants in this case therefore justifiably expect constitutional protection of their free expression. Nevertheless, this does not necessarily foreclose the application of the law of Nauru insofar as it does not conflict with the First Amendment. It is the application of the "actual malice" standard by this Court to the allegedly defamatory statements *sub judice* that defendants may justifiably expect—not the application of the libel law of Guam or Hawaii.

The Second Restatement and settled multistate defamation law provide an additional determinative factor for this Court's analysis of the interests of the parties herein.

 e. *Multistate communication involving natural person.* Rules of defamation are designed to protect a person's interest in his reputation. When there has been publication in two or more states of an aggregate communication claimed to be defamatory, at least most issues involving the tort should be determined . . . by *the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation.* This will usually be the state of the plaintiff's domicil if the matter complained of has there been published.

Restatement (Second) of Conflict of Laws § 150, Comment e (1971) (emphasis supplied). The "state of greatest harm" analysis has long been applied by courts in multistate defamation cases.[27] The Ninth Circuit Court of Appeals embraced the "state of greatest harm" concept in *Hanley v. The Tribune Publishing Company*, 9 Cir., 527 F.2d 68 (1975) and held that Nevada law would govern a Nevada citizen's libel suit against the California publisher of a newspaper printed in California and distributed in Nevada as well as in other states.[28] In

---

**24.** Plaintiffs cite *Gallegos v. Union-Tribune Publishing Co.*, 195 Cal.App.2d 791, 16 Cal. Rptr. 185 (1961), *Bakhshandeh v. American Cyanamid Co.*, 211 F.Supp. 803 (S.D.N.Y.1962), *Andretto Bank A. G. v. Goodbody & Co.*, 10 A.D.2d 696, 197 N.Y.S.2d 793 (1960), and *Philp v. Macri*, 261 F.2d 945 (9th Cir. 1958), as examples of cases in which courts "have not hesitated to apply foreign law in defamation actions." Significantly, each case predated the Supreme Court's articulation of the "actual malice" requirement in *New York Times v. Sullivan*.

**25.** Restatement (Second) of Conflict of Laws § 6(2)(g) (1971).

**26.** *Id.* § 6, Comment g.

**27.** For example, in *Dale System, Inc. v. Time, Inc.*, 116 F.Supp. 527, 530 (D.Conn.1953), the court applied the law of the plaintiff's home state on the ground that "in cases of multistate libel generally the greatest harm to repute will occur in the state of domicil."

**28.** The *Hanley* Court noted that
under choice of law principles the respective substantive rules under consideration traditionally compete on the basis of the interests of the respective states with regard to the particular controversy. . . . In the case

this case, it is in Nauru that Plaintiff DeRoburt resides and enjoys a reputation most susceptible to harm by libelous publications; under the "place of greatest harm" analysis, Nauru is therefore the site of the appropriate choice of law. Thus, the factors determinative of the interests of the parties in this case reveal interests that would be best accommodated by the application of the Nauru law of defamation subject to the limitations of the First Amendment.[29]

Defendants also contend that the contacts between the Pacific Daily News and Nauru are insufficient to support the application of Nauru law under the due process clause of the United States Constitution. They note that the Pacific Daily News has no business contacts with Nauru other than one unsolicited subscription mailed to the Australian High Commission. Such an argument erroneously implies that due process requires a court's choice of law to comport with the "minimum contacts" jurisdictional test stated in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[30] The United

---

of tort actions, relevant factors include the nature of the wrong that is alleged; the place where the harm was actually suffered; the place where the extent of injury can be best appraised. . . . In cases of defamation, these factors normally would call for application of the law of the plaintiff's domicil. . . Ordinarily, it is there, if anywhere, that plaintiff can be said to enjoy a reputation; and there, if anywhere, that reputation would suffer injury by the accused writing.
527 F.2d at 70.

**29.** The application of more than one law to a choice of law problem is not unique: In *Brewster v. Boston Herald-Traveler Corp.*, 188 F.Supp. 565 (D.Mass.1960), the court considered a multistate defamation case in which the plaintiff was a Maine resident bringing suit in Massachusetts for an allegedly libelous publication printed in Massachusetts and distributed in Maine, Massachusetts and Washington, D. C. The article appeared when the plaintiff was under consideration for counsel to the United States Senate Committee on Government Operations in Washington, D. C. The court there held that the parties were "entitled to have separate instructions of law, if necessary, and separate calculations of damage, if appropriate," for the District of Columbia, Maine and Massachusetts. *Id.* at 577. The court's action appears to have been based on the interest of the plaintiff in obtaining damages commensurate with the injury he suffered in those jurisdictions in which he enjoyed a prominent reputation.

> Moreover, in this case, unlike most cases known to me, the plaintiff will suffer a very large part of his damages, if any, not in the state of principal publication but in his own home state, the state of his principal professional and political reputation, and in the District of Columbia where the Senate Committee ordinarily meets.

*Id.*

Traditional choice of law rules have also been used to apply different rules of law to different issues arising in the same case. The application of different choice of law rules to more

than one conflict of law issue arising in a case has been given the French name *dépeçage* by some commentators. *See, e. g.*, R. A. LeFlar, American Conflicts Law (3d ed. 1977); Reese, *Dépeçage: A Common Phenomenon in Choice of Law*, 73 Colum.L.Rev. 58 (1973). An example of the use of d/epeçage under modern choice of law rules is *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) where the host guest issue was governed by New York law and the defendant's negligence was governed by Ontario law. *See* note 16 *supra*.

**30.** In support of their argument, defendants cite *Home Insurance Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930), as a "mirror-image" of the present case. *Dick* was a contract action filed in Texas in which the forum state's only connection with the suit was as the permanent residence of the plaintiff. The defendant was a Mexican company; the boat fire insurance contract from which the action arose was entered into in Mexico and covered loss occurring only in Mexican waters. The Court held that the connection between Texas and the contract action was insufficient to support the application of Texas law. 281 U.S. 407–08, 50 S.Ct. 338. Defendants herein argue that, like Texas in *Dick*, Nauru's only connection with the action is as the plaintiff's permanent place of residence.

This analogy fails in two crucial respects. First, the Supreme Court's holding in *Dick* was based partly on the fact that the plaintiff did not actually live in Texas.

> The fact that Dick's permanent residence was in Texas is without significance. At all times here material he was physically present and acting in Mexico. Texas was therefore without power to affect the terms of contracts so made. Its attempt to impose a greater obligation than that agreed upon and to seize property in payment of the imposed obligation violates the guaranty against deprivation of property without due process of law.

States Supreme Court rejected this argument in *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Choice of law determinations depend not on the "minimum contacts" required for jurisdiction, but on the presence of certain interests that would be best served by the application of the chosen law.[31] In this case, sufficient evidence of the concerns of Nauru and the plaintiff and the connections between Nauru and the present action has been submitted to at least raise a genuine issue of fact as to whether sufficient interests exist to support the application of Nauru law under the due process clause of the Fourteenth Amendment.[32] Therefore, I conclude that dismissal of counts 1 and 2 is inappropriate at this time.[33] Nevertheless, because Nauru law would be applied only insofar as it does not conflict with the First

---

281 U.S. 408, 50 S.Ct. 341. In the present case, DeRoburt lives in Nauru. Moreover, the allegedly defamatory act that is the subject of the instant action allegedly occurred in Nauru. Nauru's connection with the instant action is therefore significantly greater than that between Texas and the contract action in *Dick*. Secondly, defendants' analogy also ignores determinative choice of law considerations common to a defamation action that do not arise in a contract case. For example, there is the public policy interest of a country in protecting the reputation of its citizens and the individual's interest in receiving the protection of the laws of the country in which his reputation was most harmed. The foreseeability that a defamatory publication will be read in a certain state is another factor that is sometimes used to determine sufficient contacts for jurisdiction which reveals a connection between Nauru and the present case. *See, e. g., Anselmi v. Denver Post, Inc.*, 552 F.2d 316, 325 (10th Cir. 1977); *McGuire v. Brightman*, 79 Cal.App.3d 776, 145 Cal.Rptr. 256 (Cal.App.1978).

**31.** In *Shaffer*, Delaware used sequestered shares of stock in a Delaware corporation as the jurisdictional basis for a claim against the nonresident owners of the shares. The owners were officers and directors of the corporation who were being sued by a Delaware citizen/shareholder for having violated their duties to the corporation. The appellee asserted that Delaware's jurisdiction was based on the presence of the appellants' corporate stock in Delaware and the "interest of Delaware in supervising the management of a Delaware corporation." 433 U.S. at 213–14, 97 S.Ct. at 2585. The Supreme Court held that the mere presence of a nonresident's property in a state does not, by itself, provide sufficient ties with the forum state to support its assertion of jurisdiction. *Id.* at 209, 97 S.Ct. 2569. More importantly to the case at bar, the Court explained that though Delaware's interest in controlling the activities of nonresident corporate directors was insufficient to justify Delaware jurisdiction, the state's interest may have been sufficient to support the application of Delaware law.

The interest appellee has identified may support the application of Delaware law to resolve any controversy over appellants' actions in their capacities as officers and directors. But we have rejected the argument that if a State's law can properly be applied to a dispute, its courts necessarily have jurisdiction over the parties to that dispute. 433 U.S. at 215, 97 S.Ct. at 2586 (footnote omitted).

**32.** David G. Lang, the Republic of Nauru Secretary for Justice, states in his affidavit that he saw copies of the May 30, 1978 article in public view at the chief secretary's office in Nauru, in the Members' Library of Nauru's Parliament, and again in the chief secretary's office when a reporter from the Pacific Daily News questioned him about the article's content. Lang also states that he has read editions of the Pacific Daily News at the Nauru Public Library and the Nauru Phosphate Corporation Staff Club. David E. Orlans, manager of Nauru Air and Shipping Agency on Guam, states in his affidavit that at least two Air Nauru flights from Guam to Nauru carried copies of the May 30, 1978 edition of the Pacific Daily News. According to the Lang affidavit, copies of the pacific Daily News are regularly available because employees of Air Nauru "pick up newspapers and magazines for their friends in Nauru" and "very often newspapers are given free to passengers on the airline."

**33.** In addition to proving sufficient contacts with Nauru at trial, plaintiffs must overcome other hurdles before Nauru law can be applied herein. For example, "the party who wants the advantage of a foreign rule of law bears the burden of pleading and establishing the content of the foreign law and the governmental policies advanced by such law." *Diamond Mining and Management, Inc. v. Globex Minerals, Inc.*, 421 F.Supp. 70, 74 (N.D.Cal.1976). Additionally, the law of Nauru will not be applied insofar as it conflicts with the public policy of the State of Hawaii. *In Re Grand Jury Proceedings*, 532 F.2d 404 (5th Cir.), *rehearing denied sub nom. United States v. Field*, 535 F.2d 660, *cert. denied*, 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); *Tooker v. Lopez*, 24 N.Y.2d 659, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969); *Lilienthal v. Kaufman*, 239 Or. 1, 395 P.2d 543 (1964).

Amendment,[34] defendants' motion for summary judgment as to counts three through six will be deemed to include counts one and two.

## MOTION FOR SUMMARY JUDGMENT

■ Defendants contend that plaintiff is either a "public official" or "public figure"[35] and therefore cannot survive summary judgment in a suit for defamation unless he offers evidence upon which a jury could find with "convincing clarity" that the article was published with "actual malice." *United Medical Labs v. CBS*, 404 F.2d 706, 713 (9th Cir. 1968); *See New York Times v. Sullivan*, 376 U.S. 254, 286, 84 S.Ct. 710, 11 L.Ed.2d 686 (1968); *Tagawa v. Maui Publishing Company, Ltd.*, 50 Haw. 648, 650–51, 448 P.2d 337, 339 (1968). Plaintiff, however, does not concede that he is either a "public official" or a "public figure" within the meaning of *New York Times v. Sullivan* and its progeny.[36] Assuming *arguendo* that plaintiff is a public official or public figure for First Amendment purposes, summary judgment for the defendants is improper if plaintiff can present a genuine issue of fact as to whether the article was published with actual malice—the " 'deliberate falsification' of facts or 'reckless disregard' of the truth, *i. e.*, reckless publication despite a high degree of awareness, harbored by the publisher, of the probable falsity of the published statements." *Tagawa v. Maui Publishing Company, Ltd.*, 50 Haw. at 652, 448 P.2d at 340 (quoting *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. 710).

Plaintiff has submitted affidavits by various people which tend to show that the article was erroneous in four respects. First, DeRoburt is described as being President of Nauru at the time the loan from Nauru to the Marshall Islands was made; however, there is evidence that the loan was made on May 10, 1978, the day before DeRoburt was elected.[37] Second, DeRoburt is reported to have personally delivered the money to the Marshall Islands though there is evidence that he did not travel to the Marshall Islands between March and June of 1978[38] and was not in any way a party to the loan.[39] Third, the loan was reported to be a secret, but there is evidence that it was actually a matter of public record.[40] Finally, the loan was reportedly made in the Marshall Islands, but there is evidence that it was actually made in Nauru.[41]

■ Plaintiff also presented evidence to support his contention that the purported falsehoods were published with actual malice. First, reporter Cisco Uludong's personal commitment to the unity of Micronesia and his resultant bias against efforts to help the MIPSC is attested to by three Pacific Island leaders: Mr. Roman Tmetuchl, Chairman of the Palau Political Status Commission, Mr. Amata Kabua, Chairman of the Marshall Islands Political Status Commission, and Mr. Tony DeBrum, Vice-Chairman of the Marshall Islands Political Status Commission.[42] As a second offer of proof as to actual malice, plaintiff attempts

---

**34.** Because of the pervasive effect of the First Amendment in the area of defamation of public officials and public figures, it is likely that there will be little difference in this case whether the First Amendment is applied in conjunction with the law of Hawaii, Guam, or Nauru.

**35.** *See* Defendants' Memorandum in Support of Motions to Dismiss and for Summary Judgment at 4 (filed February 6, 1979).

**36.** *See* Plaintiff's Memorandum, *supra* note 9, at 18.

**37.** *Id.* 2 n.2; Affidavit of David G. Lang at 12 (filed March 26, 1979).

**38.** *See* Affidavit of Takes Henry at 1 (filed March 16, 1979).

**39.** *See* Affidavit of David Lang at 12 (filed March 26, 1979); Affidavit of Atlan Anien at 2 (filed March 16, 1979).

**40.** *See* Affidavit of Atlan Anien at 2 (filed March 16, 1979); Affidavit of Carmen Bigler (filed March 20, 1979).

**41.** *See* Affidavit of David Lang at 10 (filed March 26, 1979).

**42.** Attached to Mr. Tmetuchl's affidavit (filed March 16, 1979) is a June 28, 1977 letter from Mr. Uludong to U.S. Ambassador Philip Manhard, the acting U.S. representative to the Office of Micronesian Status Negotiations, in which Uludong proposed a plan which stated, *inter alia*, that "[t]he United States must de-

to establish a pattern of biased and inaccurate reporting by Uludong.[43] Third, plaintiff presented evidence to support his con-

> clare in clear terms its commitment to some form of unity." Amata Kabua communicated a similar belief regarding Uludong's bias in favor of "unity" to Mr. Joseph Murphy, editor of the Pacific Daily News, on behalf of the Marshall Islands Political Status Commission in a letter dated August 18, 1977. *See* Affidavit of Amata Kabua (filed March 16, 1979). The comments of Tmetuchl and Kabua are amplified by the affidavit of Tony A. DeBrum. DeBrum states:
>
> > 5. On the basis of the news coverage by Cisco Uludong appearing in the Pacific Daily News during the past several years and also on the basis of personal conversations affiant has had with Cisto [sic] Uludong and others who are personally acquainted with Cisco Uludong, affiant has formed the following conclusions with regard to coverage by Cisco Uludong of the separation-unity question as it relates to the future political status of the several island groups of Micronesia:
> >
> > ¶ Cisco Uludong has himself become a very strong proponent of unity for Micronesia and is also closely identified with minority opposition groups in the Marshall Islands and Palau who have favored unity and opposed separation of those groups.
> >
> > 6. Cisco Uludong was devoting extensive effort in the months of March-June, 1978, to trying to produce a "unity" vote throughout Micronesia on the question of adoption of the Federated States of Micronesia Constitution. Affidavit of Tony A. DeBrum at 1–2 (filed March 20, 1979).

43. Tmetuchl states in his affidavit that the Palau Political Status Commission sent a staff member to Guam to personally complain to Joseph Murphy, editor of the Pacific Daily News, about Cisco Uludong's biased and inaccurate reporting of Micronesian politics. He also states that Uludong's inaccurate reporting prompted the Palau Political Status Commission to run paid advertising in the Pacific Daily News as a means of placing accurate reporting of Palau political events before the people of Palau and the Western Pacific Region. Tmetuchl Affidavit, *supra* note 42, at 2–3.

> Tony DeBrum's affidavit states:
>
> > ¶ Cisco Uludong has a general reputation in the Micronesian community for untruthfulness and inaccuracy in his reporting of facts as they relate political status in Micronesia;
> >
> > 7. Cisco Uludong had sufficient access to public information, including particularly the true facts relating to dealings between the Marshall Islands and Nauru to know that the content of his story of May 30, 1978 was, in

tention that the defendants, particularly Cisco Uludong, failed to adequately investigate the May 30, 1978 article.[44] Plaintiffs

> fact, untrue. The story of May 30, 1978 was fabricated by Cicso [sic] Uludong, working perhaps with others who supported unity, to specifically embarrass the proponents of separation for the Marshall Islands and Palau, and to further embarrass Hammer DeRoburt, who had recently become President of Nauru.
>
> > 8. Cisco Uludong has regularly and routinely dealt in falsehood, misstatement of fact, character assassination and other unethical journalistic techniques as a means of furthering his own personal beliefs in Micronesian unity and opposition to the separation movements of the Marshalls and Palau.
> >
> > 9. The editors of the Pacific Daily News have been regularly advised of the difficulties of Micronesian leaders in general with Cisco Uludong and have repeatedly failed to act to correct his biased and inaccurate stories.

44. Two newspaper reports, one preceding Hammer DeRoburt's May 11, 1978 election and one printed shortly thereafter, are cited as evidence of defendants' failure to investigate. The first article written by Cisco Uludong and printed on April 29, 1978 quotes DeRoburt regarding his possible candidacy for office in the upcoming presidential election. The second article, which was printed on May 26, 1978 and bears no author's name, notes the plaintiff had recently taken office as President. These articles are cited by plaintiff as proof that, prior to the time of the May 30 article, defendants were aware that DeRoburt was not the President of Nauru. Plaintiff contends that the two articles support the inference that the defendants had reason to investigate the details of the May 30 story and that they had sources from whom information about Nauru had been obtained in the past yet they failed to verify the information contained in the May 30 article.

The affidavits of a number of commonly consulted sources for news of Nauru have also been submitted as further evidence that, though the correct information was readily available, the defendants failed to pursue anything but the most cursory of investigations. George Callison, the Director of the Bureau of Public Affairs for the Trust Territory of the Pacific Islands, states that his office in Saipan maintains records of the political activities of the islands in the Trust Territory. His office has no record of any inquiry by reporter or editor of the Pacific Daily News during May 1978 relating to loan transactions between the Marshall Islands and Nauru nor has it any record of a loan between Nauru and the Marshall Islands. Affidavit of George Callison at 1–2 (filed March 16, 1979).

have also submitted evidence that the Pacific Daily News republished the pertinent contents of the May 30 article after it was informed by a reliable source that the information contained therein was erroneous.[45] In determining whether a genuine issue exists as to actual malice, this Court is bound to view all underlying issues of disputed

> Carmen M. Bigler, the Director of the Bureau of Public Affairs Office for the District of the Marshall Islands, states that her office has had a regular liaison in attendance at virtually every session of both the Constitutional Convention and the Nitijela [Congress] of the Marshall Islands; that the Department of Public Affairs regularly responds to requests for information relating to the Nitijela, the Constitutional Convention, and the Marshall Islands Political Status Commission; and that during the month of May 1978, the Department of Public Affairs received no requests from the Pacific Daily News for information relating to activities of the Marshall Islands Political Status Commission with respect to any loan involving the Marshall Islands and Nauru. She has included copies of resolutions from her records stating the intention of the Marshall Islands legislature to seek funds from Nauru. The records were public at the time the May 30, 1978 article was written. Affidavit of Carmen Bigler (filed March 20, 1979).

> Defendants respond to this evidence with an affidavit of Leanne McLaughlin, city editor of the Pacific Daily News, which attests to the attempts made by defendants to verify the accuracy of the article. This affidavit states, *inter alia*:

> > 9. On or about May 25, 1978, the story was received and was reviewed by me and by the personnel on the editorial staff of the Pacific Daily News.

> > 10. After receipt of Mr. Uludong's story, I attempted to contact the Nauru consul on Guam, [Murray] McNeil, to check out the story but Mr. McNeil was off the island of Guam and my messages were not returned.

> Affidavit of Leanne McLaughlin at 2 (filed February 6, 1979). This testimony, however, is contradicted by the affidavit of Cora Fernandez, Mr. McNeil's secretary at the time, which states that she has no recollection of a call from McLaughlin or any other member of the Pacific Daily News during the relevant time period. Affidavit of Cora Fernandez at 2 (filed March 16, 1979).

45. The affidavit of David G. Lang, Secretary for Justice of Nauru, states that "around about June 18" he was questioned by Paul Addison, a Pacific Daily News Reporter, about the truth of the article and that he informed Addison that the article was untrue in several respects: DeRoburt was not President of Nauru when the loan was made, he was in opposition to the

fact in the light most favorable to the party opposing summary judgment. *Guam Federation of Teachers, Local 1581, A. F. T. v. Ysrael*, 492 F.2d 438 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). After viewing the evidence in this light, I conclude that summary judgment is inappropriate in this case.[46]

> loan, he did not take the loan check to the Marshall Islands, the loan took place in Nauru and it was not secret. Affidavit of David G. Lang at 10 (filed March 26, 1979). On June 29, the Pacific Daily News printed an article that noted the angry reaction of Lang and other Nauru officials to the May 30 article; however, it also reported that "sources have said that shortly after his re-election in early May, DeRoburt flew to the Marshalls to deliver the Separatist Marshalls Political Status Commission a $600,000 check."

46. This conclusion is consistent with the observation recently made by the Supreme Court in *Hutchinson v. Proxmire*, —— U.S. ——, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). In *Hutchinson*, the district court concluded that Hutchinson was a public figure and granted summary judgment because he had failed to show that the allegedly defamatory statements were made with actual malice. 431 F.Supp. 1311 (W.D.Wis.1977). "Relying upon cases from other courts, the District Court said that in determining whether a plaintiff had made an adequate showing of 'actual malice,' summary judgment might well be the rule rather than the exception." *Hutchinson*, —— U.S. at ——, 99 S.Ct. at 2680 (citing 431 F.Supp. at 1330). The Supreme Court, however, expressed serious doubt regarding the validity of such a rule.

> Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule". The proof of "actual malice" calls a defendant's state of mind into question, *New York Times v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), and does not readily lend itself to summary disposition.

*Hutchinson*, —— U.S. at —— n.9, 99 S.Ct. at 2680 n.9.

*Tagawa v. Maui Publishing Co.*, 50 Haw. 648, 448 P.2d 337 (1968) is not to the contrary. In affirming the trial court's granting of summary judgment, the Hawaii Supreme Court held: that where plaintiff is a public official and defendant is a newspaper publisher which published an allegedly defamatory column about plaintiff's official conduct, summary judgment for defendant may be granted where defendant shows through *uncontroverted* depositions and affidavits that the publication was made without deliberate falsification and without a high degree of

Therefore, IT IS HEREBY ORDERED that defendants' motions to dismiss and for summary judgment are DENIED.

awareness of the probable falsity of the statements in the publication; in such instance, there is no genuine issue of "actual malice" for trial.

*Id.* at 652, 448 P.2d at 340 (emphasis supplied). Defendants have made no such showing in the case at bar.