**Hammer DeROBURT, Plaintiff,**

v.

**GANNETT CO., INC., a Delaware corporation, and Guam Publications, Inc., a Hawaii corporation, both dba Pacific Daily News, Defendants.**

**Civ. No. 78–0375.**

United States District Court,
D. Hawaii.

Oct. 13, 1982.

Genevieve S. Richardson, A. Bernard Bays, Carlsmith, Carlsmith, Wichman & Case, George M. Allen, Honolulu, Hawaii, Donald C. Williams, Agana, Guam, for plaintiff.

David J. Dezzani, James J. Bickerton, Goodsill, Anderson & Quinn, Honolulu, Hawaii, for defendants.

## ORDER GRANTING MOTION TO DISMISS

### FACTS

SAMUEL P. KING, District Judge.

Plaintiff Hammer DeRoburt, on October 2, 1978, filed this suit against Gannett Company, Inc., and its subsidiary, Guam Publications, Inc. [collectively referred to as "Gannett"]. Jurisdiction is premised on diversity of citizenship: Gannett Company, Inc. is a Delaware corporation with its principal place of business in New York; Guam Publications, Inc. is a Hawaii corporation with its principal place of business in Guam; DeRoburt is a citizen of Nauru.[1]

Plaintiff alleges that defendants have libeled him in two articles published in the *Pacific Daily News,* a daily newspaper printed in Guam by Guam Publications. A May 30, 1978, *Pacific Daily News* article (the "May 30 article"), written by Cisco Uludong and headlined "Marshalls Separatist Movement Gets Secret Funds from Nauru," reported that President DeRoburt personally delivered to the Marshall Islands Political Status Commission ("MIPSC")[2] a loan made by Nauru in support of separa-

---

1. Nauru is an island republic in the Pacific, approximately eight and one-half square miles in area with a population of about 4000 citizens. Its vast phosphate deposits make Nauru one of the wealthiest nations, per capita, in the world. Hammer DeRoburt, in addition to being a citizen of Nauru, is also its President; however, he brings this suit in his individual rather than representative capacity.

DeRoburt was first elected president in May 1968, but he was replaced in January 1977. He remained a member of Parliament, as the leader of the opposition, until reelected president on May 11, 1978. He has been Head Chief of the Nauru Local Government Council since 1955.

DeRoburt has alleged that the 1978 loan to the Marshall Islands, in which he was reported to have been involved, actually was made by his predecessor in office on May 10, 1978—the day before DeRoburt reassumed the office of president.

2. The Marshall Islands Political Status Commission is a statutory body created by the legislature of the Marshall Islands in 1973 to represent the people of the Marshall Islands in the process of negotiation to end the U.S. trusteeship over those islands.

The Trust Territory of the Pacific Islands is one of eleven trusteeships set up pursuant to agreements between the United Nations and various nations after World War II. It is a "strategic trust" administered by the United States and contains six island districts. *See People of Saipan v. United States Dep't of the*

tion of the Marshall Islands from Micronesia.[3]

The second story, written by Paul Addison and published on June 29, 1978, ("the June 29 article") in the *Pacific Daily News,*

*Interior,* 356 F.Supp. 645, 647–48 (D.Hawaii 1973), *aff'd,* 502 F.2d 90 (9th Cir. 1974).

At the time the articles were written, the political status of the Trust Territory of the Pacific Islands was in the process of change. Its local governmental body, the Micronesian Congress, had devised a Constitution for a Unified Micronesian Nation that was to be voted on by the people of the Trust Territory in a referendum scheduled for July 12, 1978. A significant number of the Marshall Islanders perceived great disadvantage in becoming part of the Nation because the Micronesian Congress had promulgated tax policies detrimental to their interests in the past. For these reasons, the government of the Marshall Islands sought funds to assist the MIPSC in its efforts to gain independence. *DeRoburt v. Gannett Co., Inc.,* 83 F.R.D. 574, 576 n.5 (D.Hawaii 1979).

3. The May 30 article reads as follows:

SAIPAN—The Republic of Nauru secretly is backing the separation of the Marshalls from Micronesia.

The phospate-rich country has loaned thousands of dollars to finance a campaign by the Marshalls Political Status Commission, which supports separation, to reject the proposed Micronesian constitution, according to reliable sources in the Trust Territory.

Another loan from Nauru to the Marshalls in 1974 was ruled illegal by T.T. officials.

Sources say that shortly after his re-election earlier this month, Nauru President Hammer Deroburt [sic], a personal friend of Congress of Micronesia Sen. Amata Kabua, gave the separatists $600,000 of the $1 million they originally requested.

Kabua is chairman of the status commission.

The loan's term and conditions are not generally known and few people in the Marshalls are aware of it, sources said.

The sources said Marshallese separatist leaders had earlier approached Deroburt's predecessors about the loan but were politely turned down because Nauru officials did not want to be accused of "meddling" in Micronesia's internal affairs.

The Marshallese renewed their request to Deroburt after he took office. He approved it and flew to the Marshalls to personally deliver the check, sources said.

This is not the first time that Nauru has loaned money to the Marshallese. In 1974 Deroburt loaned $600,000 to the Marshall Islands Development Authority to build a copra plant and construct some docks. That

was headed "Nauru Officials Admit Lending Separatists' Loan." It reported the angry reactions of Nauru officials to the first story, as well as repeating the statements made in that story.[4]

loan was ruled illegal by the T.T. Attorney General's Office.

Nauru, whose people resemble Marshallese, has more at stake in the district than ethnic affinity. In an interview with the Daily News last April, Deroburt said the Nauru local government council, which he heads, already has $5 million in business investments in the Marshalls.

Before the commission received the $600,000 illegal loan, the Marshalls Legislature tried on two occasions earlier this year to go around existing attorney general laws and rulings barring the T.T. district legislature and their creatures from borrowing money.

The first attempt gave the commission blanket authorization to borrow money but the legislation was vetoed by Marshalls District Administrator Oscar Debrum on instructions from the T.T. attorney general.

The second attempt, which trimmed down the authorization to no more than 50 percent of all revenues collected by the Marshalls Legislature in 1977, was also vetoed by Debrum on orders from Saipan.

"He (Debrum) was advised that the position of the attorney general has not changed—that the legislatures and their creatures do not have the power to borrow money," said Scotte Stege, T.T. assistant attorney general.

Commenting on the $600,000 loan, acting Attorney General Rod Johnson said: "The district administrator knows our position and we hope that he would prevent any repayment of the loan with public funds."

4. The June 29 article reads:

NAURU—The Republic of Nauru Finance Corp. made a loan recently to persons in the Marshall Islands but senior Nauruan officials are unwilling to say to whom the loan was made or for how much.

Nauruan officials reacted angrily to a May 30 Daily News article that said the phosphate-rich republic secretly was backing the separation of the Marshalls from Micronesia.

President Hammer Deroburt's [sic] chief secretary, Peter Jones, admitted a loan had been made but added: "We've no obligation to tell you who to or for how much." Nauruan Secretary for Justice David Lang said, "As far as we're concerned, it's not a secret loan. It's a straightforward loan."

Lang said the Republic of Nauru Finance Corp. was a separate statutory company not connected to the government. Deroburt is

Plaintiff DeRoburt alleges that the stories falsely and maliciously accused him of committing serious crimes under Nauru law and of interfering with the internal political affairs of a foreign nation in violation of accepted standards of international diplomacy. His complaint also includes an allegation that the stories were published by defendants "with actual malice, that is, with actual knowledge of their falsity and/or with reckless disregard for whether they were false or not." Third Amended Complaint ¶ 21, at 16 (filed June 30, 1982).[5] DeRoburt seeks $20 million compensatory and $20 million punitive damages for allegedly having been exposed to criticism and ridicule both within Nauru and elsewhere in the world.

The present Motion to Dismiss by defendants is the latest in a long line of motions that have raised often intricate and difficult issues of law. *See, e.g., DeRoburt v. Gannett Co., Inc.,* 507 F.Supp. 880 (D.Hawaii 1981); *id.,* 83 F.R.D. 574 (D.Hawaii 1979). For the reasons discussed herein, the court grants the defendants' motion.

DISCUSSION

The defendants' motion to dismiss the suit is founded on the act of state doctrine. Their contention, in brief, is that the doctrine, when applied to this case, requires that the court dismiss for failure to state a claim upon which relief may be granted.

Plaintiff, of course, asserts that the doctrine is inapposite to the instant suit.

*1. Which law applies?*

Initially, the court must decide which law applies to the issues presented by defendants' motion.

■ Ordinarily, a federal court exercising its diversity jurisdiction must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Applying what it held would be the rule under Hawaii law, the court previously has ruled that the defamation law of Nauru would apply to this case, subject to the limitations of the First Amendment, specifically the "actual malice" standard of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The law of Nauru, moreover, has been determined to be essentially the same as the common law applied in England. Therefore, in determining what Nauru law is, the court would look to English common law for guidance.

■ The issues raised by the instant motion require a contrary result for present purposes, however. The Supreme Court has spoken specifically to this question. In *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964), a diversity case, the Court held

not a member of the company's board, Lang said.

Although Lang and Jones said the Daily News article was "a distortion of the truth," they refused to answer any questions about the loan.

Four inquiries to interview Deroburt brought no response from the president.

Sources have said that shortly after his reelection in early May, Deroburt flew to the Marshalls to deliver the separatist Marshalls Political Status Commission a $600,000 check.

Nauru has extensive business investments in the Marshalls and made loans previously to the Trust Territory district to build a copra plant and docks.

Nauruan investment and loans abroad are not new. With less than 15 years before all the island's phosphate is scheduled to be mined, most families are investing their money in nest eggs overseas.

The Nauruan government also has built a $7 million complex in Saipan and a 53-story office building in Melbourne, Australia.

Concern about the future is the dominant island issue and has been partly responsible for major political changes this year and last.

The well-respected Deroburt, who was largely responsible for securing political independence for Nauru in 1963, was ousted as president in January 1977 by a young group of educated Nauruans led by former law student Bernard Dowiyogo.

Dowiyogo resigned in April after his budget failed to win government support.

5. By order of September 14, 1982, the court dismissed Count I of the Third Amended Complaint because it failed to allege the "actual malice" required by the first amendment to the United States Constitution. The court assumes, however, that the factual allegations of the count remain by incorporation into Count II.

that "the scope of the act of state doctrine must be determined according to federal law." Touching on the fundamental policies underlying the act of state doctrine, the Court stated: "[W]e are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law." *Id.* at 425, 84 S.Ct. at 938.

*Sabbatino,* then, requires the court to apply federal law to the present motion, notwithstanding any prior ruling.

In any case, the parties agree that, with respect to the act of state doctrine, federal and Nauru/English law are very nearly identical. In fact, many of the cases applying the doctrine rely on cases decided on both sides of the Atlantic. As a result, the court may cite English law for persuasive, if not binding, authority.[6]

### 2. The Act of State Doctrine

The classic statement of the act of state doctrine in the United States was rendered by the Supreme Court in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

The Supreme Court has consistently reaffirmed the general principle in every case in which it has been at issue, *see Alfred Dunhill of London v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *Shapleigh v. Mier,* 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937); *Ricaud v. American Metal Co.,* 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), although it has not always been clear whether the doctrine was based on the Constitution, principles of international law, or choice of law principles.[7]

More recently, the doctrine has been stated as barring any examination by the courts into the validity, legality or motivation of the sovereign acts of a foreign state. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804; *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1359 (9th Cir. 1981); *Timberlane Lumber Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 549 F.2d 597, 607 (9th Cir. 1976).

In *Banco Nacional de Cuba v. Sabbatino,* the Court spelled out in explicit terms the

---

**6.** In addition, the *Sabbatino* Court explicitly left open the question "whether a state court might, in certain circumstances, adhere to a more restrictive view concerning the scope of examination of foreign acts than that required by this Court." *Id.* 376 U.S. at 425 n. 23, 84 S.Ct. at 939 n. 23. While the court does not now need to decide the question, arguably the court might apply English law that is more restrictive than federal law on this issue.

**7.** For example, in *Ricaud,* the Court stated that the act of state doctrine requires "only that" when a foreign government has acted in a certain way, the "details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision." 246 U.S. at 309, 38 S.Ct. at 313. The doctrine has moved considerably beyond this relatively limited "rule of decision" view, though it is still reflected in the Court's decision in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. at 438, 84 S.Ct. at 945.

It is clear however that the act of state doctrine is not a jurisdictional bar to adjudication but rather a prudential limitation on the courts' exercise of its otherwise established subject-matter jurisdiction.

underlying rationale and policies of the act of state doctrine. *Sabbatino* involved the expropriation by instrumentalities of the Cuban government of American-owned sugar located in Cuba. Cuba then sold the sugar to another American company for resale. When the purchaser of the sugar, acting under an agreement with the original expropriated owner, refused to make payment on the goods, the national bank of Cuba brought suit in federal district court seeking payment.

The district court, affirmed by the court of appeals, found that the original expropriation by the Cuban government was illegal under international law and refused to enforce the plaintiff's claim. The Supreme Court reversed, agreeing with the plaintiff that the federal courts could not inquire into the legality of a sovereign act of the government of Cuba. The limited holding of the case was that the courts will not examine the validity of a taking of property within its own territory by a foreign sovereign, recognized by this country at the time of suit, even if the taking allegedly violates international law. 376 U.S. at 428, 84 S.Ct. at 940.

More illuminating for present purposes than the holding is the route by which the Court arrived at its conclusion. First, it established that the act of state doctrine was compelled neither by principles of sovereign immunity, which go to the courts' jurisdiction, nor by international law. *Id.* at 421–22, 84 S.Ct. at 936. Although the act of state doctrine is not required by the "text of the Constitution," it does have "constitutional underpinnings." *Id.* at 423, 84 S.Ct. at 937. Specifically, the act of state doctrine

> arises out of the basic relationships between branches of government in a system of separation of powers. It concerns

the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Id.*

Within the Court's analysis can be discerned at least two amplectant strands of policy. One acknowledges that judicial declarations regarding the invalidity of the sovereign act of a foreign government would be "likely to give offense to" that foreign state, thereby hampering the Executive's ability to carry out our nation's foreign policy. *Id.* at 431–32, 84 S.Ct. at 941–42. By contradicting, or even by concurring in, the Executive's position on a particular issue of international relations, a court's decision might have adverse consequences both in terms of our relations abroad and relations between the branches of government.[8]

Even were it clear that the foreign state has violated standards of international law, "it would still be unwise for the courts so to determine. Such a decision now would require the drawing of more difficult lines in subsequent cases and these would involve the possibility of conflict with the Executive view." *Id.* at 433, 84 S.Ct. at 943. Thus, this aspect of the doctrine is essentially a rule of comity, or of respect for coordinate branches of government.[9]

The other facet of policy enunciated by *Sabbatino* reflects the "proper distribution of functions between the judicial and political branches." *Id.* at 427–28, 84 S.Ct. at

---

**8.** The Court further suggested that danger of conflict with the Executive Branch exists even when the Executive has remained silent on the issue involved. 376 U.S. at 432–34, 84 S.Ct. at 942–43.

**9.** One commentator has said that the United States courts, in contrast to the English cases,

have extended the act of state doctrine from a "doctrine of respect" for sovereign states to a "doctrine of embarrassment" based on the separation of powers. Singer, *The Act of State Doctrine of the United Kingdom: An Analysis, with Comparisons to United States Practice,* 75 Am. J. Int'l L. 283, 291 (1981).

939–40. As such it is concerned with the institutional competence of the courts to decide questions touching on the nation's foreign relations and on the relations among states *qua* states.[10] The act of state doctrine, in this sense, resembles the political question doctrine applied in domestic law. *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1358 (9th Cir. 1981).

In particular, this concern focuses on the absence of judicially manageable standards for resolving challenges to acts of state.[11] *See Buttes Gas & Oil Co. v. Hammer,* [1981] 3 W.L.R. 787, 810 (House of Lords).

The Fifth Circuit has expressed this idea by stating that:

> In their external relations, sovereigns are bound by no law; they are like our ancestors before the recognition or imposition of the social contract. A prerequisite of law is a recognized superior authority whether delegated from below or imposed from above—where there is no recognized authority, there is no law. Because no law exists binding these sovereigns and

allocating rights and liabilities, no method exists to *judicially* resolve their disagreements.

> *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum,* 577 F.2d 1196, 1204–05 (5th Cir. 1978) (emphasis in original).[12]

In sum, *Banco Nacional de Cuba v. Sabbatino* exposed the policies underlying the act of state doctrine, in particular deferring to the Executive the pursuit of the nation's foreign affairs and, on the other side of the coin, recognizing the courts' inferior competence in such areas.

### 3. The Present Motion

This brings the court to consideration of the arguments made in the present motion.

■ There is little dispute between the parties that the 1978 loan was an act of state of the type covered by the act of state doctrine. Plaintiff's briefs suggest that the loan falls into the "commercial activities" exception to the doctrine, but the court

---

**10.** The [act of state] doctrine recognizes the institutional limitations of the courts and the peculiar requirements of successful foreign relations. To participate adeptly in the global community, the United States must speak with one voice and pursue a careful and deliberate foreign policy. The political branches of our government are able to consider the competing economic and political considerations and respond to the public will in order to carry on foreign relations in accordance with the best interests of the country as a whole. The courts, in contrast, focus on single disputes and make decisions on the basis of legal principles. The timing of our decisions is largely a result of our caseload and of the random tactical considerations which motivate parties to bring lawsuits and to seek delay or expedition. When the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy. The executive may utilize protocol, economic sanction, compromise, delay, and persuasion to achieve international objectives. Ill-timed judicial decisions challenging the acts of foreign states could nullify these tools and embarrass the United States in the eyes of the world. *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1358 (9th Cir. 1981).

**11.** The *Sabbatino* Court indicated that a type of sliding scale should be applied in judging the accessibility of the particular problem to judicial review:

> It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.

376 U.S. at 428, 84 S.Ct. at 940.

Although this statement would appear to permit a court to avoid the act of state doctrine when it finds that the violation of international law is clear, the Court nevertheless elsewhere eschewed this approach *as potentially embarrassing* to the Executive. *Id.* at 433, 84 S.Ct. at 943; *see* text following note 8, *supra.*

**12.** Actually, the Fifth Circuit affirmed the dismissal of the suit on the basis of the political question doctrine, which deprives the court of jurisdiction. The district court had dismissed on the act of state doctrine.

finds little merit to the argument. Indeed, plaintiff makes little of the point himself. *Alfred Dunhill of London v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), which established a commercial activity exception,[13] itself turned on the absence of any "statute, decree, order or resolution of the Cuban Government itself" approving of or authorizing the challenged act in holding that the act of state doctrine did not apply to the purely commercial activities of a state or its agents. *Id.* at 695, 96 S.Ct. at 1861.

Plaintiff's contention is based primarily on the ground that the 1978 loan was made not by the Government of Nauru but by the Republic of Nauru Finance Corporation ("RONFIN"), and therefore was not an act of state. Yet, Plaintiff himself characterizes RONFIN as "a separate statutory corporation *wholly owned by the Government of the Republic of Nauru and which operates as the commercial lending arm of the Government. . . .* Because the liabilities of RONFIN are ultimately guaranteed by the Republic of Nauru, Cabinet approval is required for loans above a certain amount . . . ." Plaintiff's Memorandum in Opposition at 11 n. 6, filed August 23, 1982 (emphasis added). And defendants have submitted as an exhibit, among other things, a document entitled "Republic of Nauru, Cabinet Submission No. 41/1978, Republic of Nauru Finance Corporation, Proposed Loan of $A600,000 to Marshall Islands Nitijela [Legislature]," dated March 4, 1978, and bearing the name of the Minister for Island Development & Industry. The document recommends to the Cabinet of Nauru that it approve RONFIN making the loan to the Marshall Islands, and at paragraph 4 states: *"Apart from purely commercial lending considerations* there are considerations relating to the relationship, both current and in the future, between Nauru and the people of the Marshall Islands." (Emphasis added.)

Certainly, these facts compel a finding that the 1978 loan by RONFIN was effectively an act of the state of Nauru.

Furthermore, in *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1360 (9th Cir. 1981), the Ninth Circuit held:

> While purely commercial activity may not rise to the level of an act of state, certain seemingly commercial activities will trigger act of state considerations. . . . When the state *qua state* acts in the public interest, its sovereignty is asserted. The Courts must proceed cautiously to avoid an affront to that sovereignty. . . . [W]e find that the act of state doctrine remains available when such caution is appropriate regardless of any commercial component of the activity involved.

That holding eliminates any doubts regarding the classification of the 1978 loan as an act of the state of Nauru.

■ Plaintiff's primary argument is that this case raises no act of state concerns, or that any that it arguably raises are insignificant and peripheral to the central issues of the case. The principal relevant allegations in the plaintiff's Third Amended Complaint are set out in the margin.[14]

---

**13.** In fact, only four justices joined in finding a broad, general commercial activities exception. The actual holding was narrower and limited to the facts of the case.

**14.** The Third Amended Complaint, filed June 30, 1982, reads in relevant part:

[¶] 9. The words contained in the May 30, 1978 story were false in the following respects:

(a) The Republic of Nauru did not secretly back the separation of the Marshall Islands from Micronesia;

(b) No loan from Nauru to the Marshall Islands in 1974 was ruled illegal;

(c) Plaintiff made no loan to the Marshall Islands in 1974;

(d) The loan of $600,000 referred to in the story (the reported loan) was not made at all. A loan of $600,000 (the actual loan) was made prior to Plaintiff's re-election to the office of President on May 11, 1978;

(e) The actual loan was not secret but in fact the terms and conditions of the actual loan were well known and in particular in the Marshall Islands where such a loan was publicly resolved to be taken by both the Nitijela (legislature) and by the Marshall Islands' Constitutional Convention on February 28, 1978, and further the making of the actual

loan was broadcast by radio and widely publicized;

(f) Plaintiff's predecessors as President did not turn down the said loan or any such applications for loans from the Marshall Islands; the actual loan was made during the presidency of Plaintiff's immediate predecessor;

(g) The Marshallese did not renew or make a request to Plaintiff after he took office on May 11, 1978 for any loan, nor did Plaintiff approve of any loan or fly to the Marshall Islands to deliver the said or any check; and

(h) No loan was made by the Republic or Government of Nauru to the Marshall Islands in 1978 at all; the actual loan of $600,000 was made by the Republic of Nauru Finance Corporation, a legal entity separate from the Government of Nauru, on May 10, 1978. [¶] 10. The words contained in the May 30, 1978 story by their natural and ordinary meaning or by innuendo meant and were understood to mean the following:

(a) That Hammer DeRoburt as President of Nauru and as Head Chief and as a member of Parliament of Nauru was guilty of conduct intended to deceive and which did deceive the public of Nauru and of the Marshall Islands and/or those then responsible for the government of the Marshall Islands, namely the United States of America as Trustee under the terms of a Trusteeship Agreement with the United Nations approved by the United States on July 18, 1947;

(b) That Hammer DeRoburt as President of Nauru and as Head Chief and as a member of Parliament of Nauru violated the Constitution of the Republic of Nauru;

(c) That Hammer DeRoburt was guilty of serious breaches of the criminal laws of Nauru and of the laws of the Trust Territories;

(d) That Hammer DeRoburt's motives for making or agreeing to make or authorizing the making of the reported or actual loan was the furtherance of the private commercial interests of a section of the citizens of Nauru and/or public commercial interests of Nauru and not the welfare of the citizens of the Marshall Islands nor the furtherance of their best political interests;

(e) That Hammer DeRoburt was improperly interfering with and subverting the free election and self determination of the peoples of the Marshall Islands in respect of a referendum to be held on July 12, 1978;

(f) That Hammer DeRoburt covertly circumvented the due proper and lawful process of making loans by Nauru to other countries and/or the receiving of such loans by the Marshall Islands;

(g) That Hammer DeRoburt covertly, criminally and/or unlawfully caused or was party to the misuse of the public funds of Nauru;

(h) That Hammer DeRoburt caused or was party to the making of an irrecoverable loan to the Marshall Islands out of the public funds of Nauru;

(i) That Hammer DeRoburt caused or was party to the making of the reported or actual loan for the purpose of bribing the separatist movement in the Marshall Islands and/or all those who might support or oppose it for the purpose of applying financial pressure and incentives in order unfairly and undemocratically to attain the separatists' political objectives;

(j) That Hammer DeRoburt debased his office as Head of State by personally carrying funds unlawfully obtained and illegally to be used to subvert an election to be held under the supervision of the United States and the United Nations to determine the future of peoples who were the subject of a United Nations Trust;

(k) That Hammer DeRoburt engaged in illegal activity and interfered in the internal political processes of the Marshall Islands by him as Head of State of the government of Nauru in breach of international law and of established international standards of diplomacy and international relations; and

(*l*) That Hammer DeRoburt was guilty of such gross misconduct as to be unfit and unworthy to hold public office.

. . . .

[¶] 14. The words contained in the June 29, 1978 story were false in each respect set forth in Paragraph 9 above . . . .

[¶] 15. The words contained in the June 29, 1978 story by their natural and ordinary meaning or by innuendo meant and were intended to mean the following:

(a) Hammer DeRoburt realleges and incorporates herein by reference the meanings set forth in Paragraph 10 of this Complaint;

. . . .

(e) That Hammer DeRoburt sought improperly to influence or interfere with the internal affairs of the Marshall Islands by the use of the wealth of Nauru for the ulterior motive of prospering and safeguarding the private investments of the citizens of Nauru or some of them in the Marshall Islands;

(f) That the conduct set forth in paragraph 15(e) above was part of the overall strategy and course of dealing of Hammer DeRoburt (and under his Presidency of Nauru) in dealing with other countries;

(g) That Hammer DeRoburt despotically and wrongfully reversed the decision to refuse such a loan made by the educated and conscientious members of the previous government; and

(h) That Hammer DeRoburt was guilty of such gross misconduct as to be unfit and unworthy to hold public office.

. . . .

[¶] 17. By reason of the aforesaid, Hammer DeRoburt has been greatly injured in his character, credit, and reputation, both personally and in his office, and has been brought into public scandal, odium, and disrepute in Nauru and elsewhere in the world.

Plaintiff's suit alleges essentially that the defendants' articles accused him of having been primarily responsible for the making of a loan from the government of Nauru to the Marshall Islands, which loan the defendants have characterized as being secret, illegal and improperly motivated. He further alleges that the articles were false in every significant respect, admitting only that an entirely legal, proper and public loan of $A600,000 [Australian dollars] was made by his predecessors in office. The significant allegations, therefore, are that (1) DeRoburt had nothing whatsoever to do with the making of any loan to the Marshall Islands and (2) any loan that was made by Nauru in 1978 was neither secret, illegal nor for improper purposes.

The defendants, in their motion, point primarily to the plaintiff's challenge to the manner in which the articles characterized the loan. They say that the act of state doctrine forbids inquiry into whether the loan made by Nauru was what the articles said it was, namely secret, illegal and for improper purposes. This, says Gannett, would directly contravene the policies underlying the act of state doctrine possibly by offending the sovereign state of Nauru, by contradicting and/or embarrassing the Executive in its exercise of foreign policy, and by steering the court into uncharted judicial waters. Defendants also argue that the question whether DeRoburt was involved in the loan is itself a forbidden inquiry into the motivation of the government of Nauru.

Plaintiff argues pervicaciously that the act of state doctrine does not apply to situations such as that presented by this litigation. His principal point appears to be that past cases have applied the doctrine only when the validity, legality or motivation of the act of state in question is the central issue in the case. He then asserts, without admitting, that the validity, legality and

motivation of the 1978 loan are at most issues peripheral to what is contended to be the central question: whether DeRoburt was involved in arranging and making the loan.

It is true that many, if not most, of the cases applying the act of state doctrine differ in some significant respects from the present case. These cases have involved usually either expropriations of American-owned property by foreign states, *e.g.*, *Alfred Dunhill of London v. Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (act of state argument rejected); *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (same); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (act of state argument successful); *Shapleigh v. Mier*, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (same); *Ricaud v. American Metal Co.*, 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (same); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (same); *Hunt v. Mobile Oil Corp.*, 550 F.2d 68 (2d Cir. 1977) (same), or antitrust and contractual claims alleging interference with overseas business interests, *e.g.*, *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (act of state argument successful); *International Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354 (9th Cir. 1981) (same); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196 (5th Cir. 1978) (same); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977), *cert. denied*, 432 U.S. 904, 97 S.Ct. 2947, 53 L.Ed.2d 1076 (same); *Timberlane Lumber Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 549 F.2d 597 (9th Cir. 1976) (act of state argument rejected); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 461 F.2d 1261 (9th Cir. 1972), *aff'g*, 331 F.Supp. 92 (C.D.Ca. 1971), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972) (act of state

---

[¶] 20. The stories of May 30, 1978 and June 29, 1978 are defamatory in the manner set forth in paragraphs 10, 11, 14, 15 and 16 above and in accusing Plaintiff DeRoburt of engaging in illegal activity and interfering in

the internal political processes of the Marshall Islands by him as Head of State of the government of Nauru in breach of international law and of established international standards of diplomacy and international relations.

argument successful); *Bokkelen v. Grumman Aerospace Corp.*, 432 F.Supp. 329 (E.D. N.Y.1977) (same); *Buttes Gas & Oil Co. v. Hammer*, [1981] 3 W.L.R. 787 (House of Lords) (same).

Thus, the usual act of state doctrine case is one in which the plaintiff (or counterclaimant) has been harmed by some action of a foreign state that is induced by or taken in conspiracy with a private third party who is made the defendant. These cases entail more or less direct challenges to the acts of foreign states. In other words, these are cases in which the foreign sovereigns, had they been private parties, probably would have been joined.[15]

Yet, there are significant exceptions to this general pattern. *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977), *cert. denied*, 432 U.S. 904, 97 S.Ct. 2947, 53 L.Ed.2d 1076, an antitrust suit, involved the nationalization by Libya of Hunt's oil lease and other assets in that country. Hunt alleged that an agreement into which he had entered with the defendants, several major oil companies, was in reality a tool by which the defendants had placed Hunt in position from which he would be unable to continue his amicable relations with Libya, and that as a result he lost his business in that country. The complaint thus was not that Libya had been a co-conspirator with the defendants, but that Libya had become the unwitting instrument of the defendants' illegal purposes.

Saying that the excision of Libya from the suit did not eliminate its actions as a necessary element of the cause pleaded, the Second Circuit affirmed the dismissal of the claim on the basis of the act of state doctrine. *Id.* 76. The court noted, in particular, that an examination of the motivation of the Libyan action "inevitably involves its validity." *Id.* 77. This, said the court, was forbidden by the act of state doctrine.

Thus, *Hunt* stands for the proposition that the act of state doctrine extends to situations in which the act of state in question is an element of the claim being made but does not require a direct challenge to the legality of the sovereign act; for, in fact, Hunt had not challenged the Libyan action at all.

Another case, upon which the defendants rely heavily, is *Buttes Gas & Oil Co. v. Hammer*, [1981] 3 W.L.R. 787 (House of Lords). In that case, two United States oil companies, Buttes Gas & Oil Co. ("Buttes") and Occidental Petroleum Corp. ("Occidental"), had been granted oil concessions near the island of Abu Musa in the Persian Gulf. Occidental had received its concession from the ruler of Umm al Qaiwain (or Qaywayn) in November 1969, while Buttes had received its concession from the ruler of Sharjah in December 1969. Umm al Qaiwain and Sharjah are neighboring Arab Emirates on the Persian Gulf. When oil was discovered under the seabed near the island, a dispute arose between Buttes and Occidental regarding rights to the oil deposits.

Ultimately, after a series of events too complicated to repeat here, *see Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196 (5th Cir. 1978); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (C.D. Cal.1971), Occidental was divested of its concession in the area.

The *Hammer* suit arose initially as a defamation action. Occidental's president, Armand Hammer, stated at a London press conference that a decree by the ruler of Sharjah, declaring new territorial limits that included the disputed area, had been unlawfully and fraudulently backdated to September 1969. Hammer also stated that the backdating had occurred at Buttes' instigation, in order to give Buttes the exclusive concession in the area. Buttes then sued Occidental and Hammer for slander.

---

**15.** The act of state doctrine, as a result, is usually raised as a defense to the claim being made. *Sabbatino* and *Buttes Gas & Oil Co. v. Hammer* are notable exceptions. *Sabbatino* was a case in which the foreign state was the plaintiff and raised the doctrine to prevent a defense based upon the alleged illegality of the expropriation on which the plaintiff's claim was founded. But the case still involved someone harmed by and challenging the validity of an act of state.

Occidental pleaded justification in defense of the slander, promptly counterclaimed in conspiracy, alleging the same facts that formed the basis of Buttes' slander claim, and salvoed with a libel claim of its own.

The case went before the House of Lords on Buttes' motion to strike the counterclaims and the defense on the basis of the act of state doctrine. After an extensive exegesis on the act of state and related doctrines, the House of Lords agreed with Buttes and dismissed the defense and counterclaims. Because of the procedural posture of the case, the Lords also dismissed Buttes' slander suit.

The Lords, per Lord Wilberforce, first parsed the act of state doctrine into what it found to be its various versions under English law. Having concluded that none of these applied to the case, Lord Wilberforce stated that he did not "regard the case against justiciability of the instant disputes as validated by the rule itself. If it is to be made good it must be upon some wider principle." 3 W.L.R. at 804. "In my opinion," he continued, "there is, and for long has been, such a general principle, starting in English law, adopted and generalised in the law of the United States of America which is effective and compelling in English courts. This principle is not one of discretion, but is inherent in the very nature of the judicial process." Id.

Lord Wilberforce then went on to analyze and compare United States cases applying the act of state doctrine[16] and ultimately concluded:

> If Occidental is to succeed in either its counterclaim for conspiracy, *or in the slander action,* it is necessary to show that these actions were brought about by Buttes, more exactly by a fraudulent con-

spiracy between Buttes and Sharjah. This certainly involves an examination of the motives (exclusive or dominant?) for the action of Sharjah in making and, if proved, backdating the decree of 1969/70. It involves establishing that the actions at least of Sharjah, and it appears also of Iran and of Her Majesty's Government, were at some point unlawful. "Unlawful" in this context cannot mean unlawful under any municipal law (I remind that Occidental does not contend that the Sharjah decree was unlawful under the law of Sharjah), but under international law . . . .

> It would not be difficult to elaborate on these considerations, or to perceive other important inter-state issues and/or issues of international law which would face this court. They have only to be stated to compel the conclusion that these are not issues upon which a municipal court can pass. Leaving aside all possibility of embarrassment in our foreign relations . . . there are—to follow the Fifth Circuit Court of Appeals [in *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*]—no judicial or manageable standards by which to judge these issues, or to adopt another phrase . . . , the court would be in a judicial no-man's land: the court would be asked to review transactions in which four sovereign states were involved, which they had brought to a precarious settlement, after diplomacy and the use of force, and to say that at least part of these were "unlawful" under international law.

*Id.* 810 (emphasis added).

The opinion concluded by holding that: "The plea of justification made by Occiden-

---

16. Lord Wilberforce also noted:

> The constitutional position and the relationship between the executive and the judiciary in the United States is neither identical with our own nor in itself constant. Moreover the passages which I have cited lay emphasis upon the "foreign relations" aspect of the matter which appeared important to the United States at the time. These matters I have no wish to overlook or minimize. I appreciate also Mr. Littman's [Occidental's counsel] argument that no indication has

> been given that Her Majesty's Government would be embarrassed by the court entering upon these issues. But, the ultimate question what issues are capable, and what are incapable, of judicial determination must be answered in closely similar terms in whatever country they arise, depending, as they must, upon an appreciation of the nature and limits of the judicial function. This has clearly received the consideration of the United States courts.
> 3 W.L.R. at 809.

tal in the slander action raises the same issues as the conspiracy counterclaim and is for the same reason not capable of being entertained by the court."

Recognizing that the *Hammer* case involved the conspiracy counterclaim, the case represents nevertheless persuasive authority for the proposition that the act of state doctrine may apply, when otherwise appropriate, to cases like the one presently at bar.

In any case, whether the act of state doctrine applies should not turn on the issue being raised in an unusual factual setting. The crucial question before the court is whether to proceed to the merits of plaintiff's claims would do violence to the policies underlying the act of state doctrine, and not whether this case falls within some formulaic definition of the "type" of cases in which the doctrine applies. As a general proposition, facts and circumstances rarely, if ever, appear in precisely the same pattern. Strict adherence to fact patterns would hamper the forward development of the law. The question presented by this motion must be decided by reference to other, more fundamental considerations.[17]

In the present action, plaintiff DeRoburt has pleaded libel. A necessary element of any libel action is that a defamatory statement be published. Without the sting of the defamatory statement, there can be no libel. *See* W. Prosser, *Handbook of the Law of Torts* § 111, at 739–40 (4th ed. 1971)

[hereinafter cited as "Prosser on Torts"]. DeRoburt says he was libeled by Gannett's articles because he didn't have anything to do with the loan, which was characterized as being secret, illegal and for improper purposes. This is not a case of per se libel. It is not libelous as such to say that a certain individual was involved in the making of a loan from one country to another, even if it is further stated that he personally delivered the check, for countries make and receive loans regularly and legally. What DeRoburt complains of is that the articles accused him of having made a loan that was secret, illegal and improperly motivated. If his character and reputation were besmirched, it was not because he was said simply to have made a loan, but because that loan was said to be an evil thing.

In this light, the court views as disingenuous the plaintiff's argument that the validity, legality and motivation of the loan will not be an issue in the case.[18]

In the first place, the Third Amended Complaint itself alleges the falsity of the characterization of the loan. *See* Third Amended Complaint at ¶ 9, filed June 30, 1982. Thus, plaintiff himself has placed the issue into dispute.[19] In addition, as defendants rightfully point out, the characterization of the loan remains a crucial element of the alleged damages. *Id.* ¶ 10, ¶ 15. This is true under the pleadings, *see* Third Amended Complaint at ¶¶ 10, 15, 17, 20, and factually as well. For example, if the jury

---

**17.** In *Timberlane Lumber Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 549 F.2d 597, 607 (9th Cir. 1976), a case in which the doctrine was found not to apply because no "act of state" had occurred, the Ninth Circuit said that the "touchstone" of the act of state doctrine is "the potential for interference with our foreign relations .... [W]e do not wish to challenge the sovereignty of another nation, the wisdom of its policy, or the integrity and motivation of its action."

**18.** Plaintiff argues in his brief in opposition to the motion that he will present no evidence regarding the validity, legality or motivation for the 1978 loan. This assertion puzzles the court. Throughout the four-year course of this litigation, the plaintiff has appeared ready to present evidence on precisely this issue. In pre-trial statements, witness lists and offers of proof, the court has noted repeated references

to evidence regarding the general falsity of the Gannett stories, and the making of and circumstances surrounding the "actual" loan. Moreover, at oral argument on this motion, plaintiff's counsel conceded that whether the loan was in fact secret, illegal and for improper purposes is a relevant question in the suit. And despite the assertion that the characterization of the loan would not be disputed, plaintiff, for obvious reasons, declined to stipulate that the loan was secret, illegal and for improper purposes..

**19.** Compare *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* in which the court noted that the plaintiff's attempt to characterize the suit as not challenging an act of state was contradicted by its own moving papers and by its complaint. 331 F.Supp. at 110.

were to find that DeRoburt, in fact, made the loan, they might find nevertheless that he was libeled by the false characterization of the loan.[20] The less accurate the characterization, the more damage would have been done to DeRoburt's reputation.

More telling than these is Gannett's correct assertion that, whatever DeRoburt intends *vel non* to prove, the *defendants* are entitled to raise as a defense the truth of the stories. Under the applicable Nauru/English law, this is stated as the defense of justification. Truth in this sense may refer to the "substantial" truth of the stories.[21] In order to prevail, defendants need not prove the truth of every detail of their articles, only the substantial truth. Therefore, defendants may attempt to prove that DeRoburt made the loan and that the loan was secret, illegal and improperly motivated.

Plaintiff's argument—that proving the secretiveness, illegality and impropriety of the loan would only strengthen *his* hand by making the libel that much worse—misses the point. He assumes that the jury will find that he had nothing to do with the loan. If parties could argue both sides of a case, courts would have nothing to decide. Defendants' position appears to be that, even if DeRoburt did not personally deliver the check, as reported, he was in such a position within the government and society of Nauru that a jury might find it reasonable to infer that he had something to do with the making of the loan.[22] If the defendants can so convince the jury, they might well prove the substantial truth of the articles and thereby defeat liability. Under these circumstances, the defendants would be well within their rights to attempt to prove that the loan made by Nauru to the Marshall Islands was indeed secret, illegal and for improper purposes.

The court is convinced, despite plaintiff's position, that resolution of the central issues in this case, either for or against the plaintiff, will inevitably lead to this court's examining or "sitting in judgment on" the validity, legality and motivation of the government of Nauru in making the 1978 loan to the Marshall Islands, and that such an examination is forbidden by the act of state doctrine, its underlying policies and rationale. The court finds that the issues raised by the defendants' characterization of the loan are sufficient alone to raise an effective act of state doctrine defense, and therefore it need not decide whether the questions surrounding DeRoburt's involvement in the loan implicate act of state considerations.[23]

Generally, in act of state doctrine cases, the act of state in question in a sense gives

---

**20.** Compare:

Because a private antitrust claim requires proof of damage resulting from forbidden conduct, ... plaintiffs necessarily ask this court to "sit in judgment" upon the sovereign acts pleaded, whether or not the countries involved are considered co-conspirators.... [S]uch inquiries by this court into the authenticity and motivation of the acts of foreign sovereigns would be the very sources of diplomatic friction and complication that the act of state doctrine aims to avert.

*Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. at 110 (citations omitted).

**21.** Under English law:

The defendant may make out the truth of so much of the libel as he can, and though he will be liable in damages for any statements which add to the sting of the libel and which he has not proved true, he can still rely on his partial justification in mitigation of damages. Gatley on Libel & Slander § 357 (1981). *See also* Prosser on Torts § 116, at 798–99.

**22.** The court notes, in this regard, that the government of Nauru was reported also to have made a loan to the Marshall Islands in 1974, while DeRoburt was then president of Nauru. But DeRoburt, in his complaint, states only that: "Plaintiff made no loan to the Marshall Islands in 1974." Third Amended Complaint at ¶ 9(c).

**23.** The court does note however that several of the cases applying the act of state doctrine to bar suits involved allegations that private parties *induced* foreign governments to act in wrongful or illegal ways. *See, e.g., American Banana Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826; *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum,* 577 F.2d 1196; *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, aff'd, 461 F.2d 1261 (9th Cir. 1972), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221; *Northrop Corp. v. McDonnell Douglas Corp.,* 498 F.Supp. 1112 (C.D.Cal. 1980); *General Aircraft Corp. v. Air America, Inc.,* 482 F.Supp. 3 (D.D.C.1979); *Bokkelen v.*

rise to or instigates the cause of action. In a strict sense, then, the acts of the government of Nauru did not give rise to the libel cause of action pleaded herein, as they would have if, for example, Gannett under some theory sued DeRoburt for having made the loan. This is a difference without a distinction, however, for proof of the elements of the libel cause of action invariably would require the court, with the finder of fact, to inquire into areas that would violate the policies of the act of state doctrine.[24] That is, the elements of the alleged libel in this case so thoroughly implicate the underlying facts surrounding the making of the 1978 loan that the court would be forced to examine them as though they had been brought directly into controversy. That such an examination must be prevented can be discerned simply by supposing that the jury will find in defendants' favor on all relevant issues. Nothing might embarrass the Executive more,[25] nor offend the Republic of Nauru more, nor be less appropriate for resolution by a jury sitting in Honolulu, than a determination that the loan made by Nauru to the Marshall Islands in 1978 was made secretly, illegally and with improper or wrongful purposes.[26] The act of state doctrine seeks to prevent precisely this kind of judicial action.[27]

Accordingly, based upon the foregoing, IT IS HEREBY ORDERED AND ADJUDGED that defendants' Motion to Dismiss is GRANTED and that Plaintiff's suit is therefore DISMISSED for failure to state a claim upon which relief may be granted.[28]

Furthermore, given the court's ruling herein, IT IS HEREBY ORDERED that all

---

*Grumman Aerospace Corp.,* 432 F.Supp. 329 (E.D.N.Y.1977). The court suggests, without holding, that the principle might apply even more strongly when the party accused of having induced the act of state is himself a member of that government.

**24.** For example, among the issues that the court and/or jury would be called upon to decide are: whether Nauru was secretly backing the separation of the Marshall Islands from Micronesia; whether the loan was illegal under Nauru law, "Micronesian" law or international law; whether the loan was motivated by the commercial self-interests of Nauru, in disregard of the best interests of the Marshall Islands; and whether the loan was intended to subvert and undermine the normal democratic processes of the Marshall Islands.

**25.** The court takes judicial notice of the fact that the separation of the Marshall Islands from the United States' Trusteeship has been a "live" issue in recent months, with negotiations often difficult and delicate. *See* Marshall Islands Journal, Aug. 4, 1982, at 1, col. 1; *id.,* Aug. 2, 1982, at 1, col. 3; Honolulu Advertiser, July 23, 1982, at ____, col. 1; Honolulu Star-Bulletin, July 15, 1982, at A–21, col. 1.

In addition, the defendants have provided the court with several exhibits obtained by requests to the U.S. Department of the Interior under the Freedom of Information Act. These documents, from the files of the Office of Micronesian Status Negotiations of the National Security Council, demonstrate that the Executive has, at least, been monitoring the defendants' reports of the loans made by Nauru to the Marshall Islands.

Although the court does not know what position, if any, the Executive has taken on the issues presented by this case, it is evident nonetheless that these issues abut areas of concern for the nation's foreign policy.

**26.** The court also notes the potential ramifications following the court's finding that an incumbent head of state of a foreign state was guilty of illegal and improper activities.

**27.** The court does not lay down, as plaintiff has argued, a rule of blanket press immunity for statements published about foreign officials. Clearly, the act of state doctrine will not apply in every case in which a foreign official may have been libeled. But where, as here, resolution of a libel action will tread upon the policies forming the basis of the act of state doctrine, the court will be foreclosed from hearing such a case.

Moreover, nothing in the act of state doctrine prevents a plaintiff seeking relief in the courts of his own country or through diplomatic channels. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. at 422–23, 84 S.Ct. at 937; *Ricaud v. American Metal Co.,* 246 U.S. at 310, 38 S.Ct. at 314; *Oetjen v. Central Leather Co.,* 246 U.S. at 304, 38 S.Ct. at 311; *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. at 109 (quoting *American Banana Co. v. United Fruit Co.,* 166 F. 261, 266 (2d Cir. 1908), *aff'd,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909).

**28.** *See Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 113 (C.D.Cal. 1971), *aff'd,* 461 F.2d 1261 (9th Cir. 1972), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221.

other motions, appeals from magistrate's decisions, etc., now pending before the court are at this time DISMISSED as moot.